## POLLER *v.* COLUMBIA BROADCASTING SYSTEM, INC., ET AL.

No. 45. Argued November 13–14, 1961.—Decided February 19, 1962.

*Morris Wolf* argued the cause for petitioner. With him on the briefs was *Abraham L. Freedman.*

*Samuel I. Rosenman* argued the cause for respondents. With him on the briefs was *Ambrose Doskow. Leon Brooks* entered an appearance.

MR. JUSTICE CLARK delivered the opinion of the Court.

The question involved here is whether this treble damage action based on alleged violations of the restraint of trade and monopoly sections of the Sherman Law [1] was rightly terminated by a summary judgment of dismissal. The petitioner, Lou Poller, is the assignee of the Midwest Broadcasting Company, a dissolved corporation. In 1954 Midwest was the owner and operator of WCAN, an ultra high frequency (UHF) [2] broadcasting station

---

[1] Section 1 of the Sherman Act provides that: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal . . . ." 26 Stat. 209, as amended, 15 U. S. C. § 1.

Section 2 of the Sherman Act provides that: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor . . . ." 26 Stat. 209, as amended, 15 U. S. C. § 2.

[2] The terms ultra high frequency (UHF) and very high frequency (VHF) refer to the wave lengths of the electrical impulses which are projected by broadcasting stations to carry programs to receiving sets. Prior to 1952 only the VHF portion of the spectrum was authorized. Generally TV receivers are manufactured only to receive VHF signals and must be modified by an owner to receive UHF.

located in Milwaukee. The station was affiliated with the Columbia Broadcasting System network and was of the alleged value of $2,000,000. Poller charged that the respondents in 1954 entered into an unlawful conspiracy to eliminate WCAN from the broadcast field in Milwaukee.[3] It was a part of the conspiracy that respondent Holt was to secure in his name an option to purchase WOKY, a competing but inferior UHF broadcaster in Milwaukee. When and if the Federal Communications Commission amended its multiple ownership rules, then under consideration, so as to permit CBS to own UHF stations in addition to its VHF ones, Holt was to assign his option to CBS if it so elected. In that event, it was agreed CBS would cancel its affiliation agreement with WCAN pursuant to its option in that contract and in due course consummate its purchase of WOKY. This would place WCAN in the precarious position of competing with the two major national networks with stations in Milwaukee. Being unable to survive such competition, its only course would be to liquidate at distressed prices its valuable equipment and facilities only recently acquired. CBS might then acquire them at its own price for use in its new operation which was necessary because of the inferior quality of those of WOKY. CBS would then have Midwest's superior facilities and equipment which with the WOKY license would enable it to start broadcasting at a minimum expense and the least possible delay. Poller further claimed that the overall purpose of CBS was to destroy UHF broadcasting, which had only been permitted to enter the field in 1952, in order to protect its vast interest in VHF stations throughout the United States. Finally, he alleged the conspiracy was so successful that CBS not only acquired WCAN at a loss of

---

[3] The conspirators were alleged to be Columbia Broadcasting System, Inc.; CBS–TV; J. L. Van Volkenburg, President of CBS–TV; H. K. Akerberg, Vice President of CBS–TV; Bartell Broadcasters, Inc., owners of WOKY; and Thad Holt, a management consultant.

$1,450,000 to Midwest but that the latter was obliged to buy the facilities and equipment of WOKY at exorbitant prices and to agree to continue broadcasting from the latter's premises—which was done "in order to pretend that there was no restraint of trade or elimination of competition . . . ." However, WCAN continued in business only 10 days after CBS started its broadcasts on February 17, 1955. CBS discontinued UHF broadcasting in 1959 when it became affiliated with a Milwaukee VHF station.

At the hearing on the motion for summary judgment the trial judge held that the injury suffered was *damnum absque injuria,* stating that CBS had a right to purchase WOKY, subject to Federal Communications Commission approval, and to cancel its affiliation contract with WCAN. 174 F. Supp. 802. The Court of Appeals affirmed with Judge Washington dissenting, 109 U. S. App. D. C. 170, 284 F. 2d 599, and we granted certiorari, 365 U. S. 840. We now conclude that there was a genuine issue as to material facts and that summary judgment was not therefore in order.

## I.

Summary judgment should be entered only when the pleadings, depositions, affidavits, and admissions filed in the case "show that [except as to the amount of damages] there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56 (c), Fed. Rules Civ. Proc. This rule authorizes summary judgment "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, . . . [and where] no genuine issue remains for trial . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Sartor* v. *Arkansas Natural Gas Corp.,* 321 U. S. 620, 627 (1944). We now examine the contentions of the parties to determine whether under the rule summary judgment was proper.

## II.

The respondents in their motion for summary judgment depended upon the affidavits of four persons. The first is Richard Salant, Vice President of CBS; another, Jay Eliasberg, Director of its Research Division; a third, Lee Bartell, who made the sale of WOKY to CBS at a $50,000 profit; finally, Thad Holt, a codefendant who received $10,000 from the transaction. These were supplemented by material taken from petitioner's depositions of Salant and CBS President Stanton. It is readily apparent that each of these persons was an interested party.

Respondents appear to place most reliance on the Salant testimony, and we shall, therefore, take it up in some detail. It projects three defenses, the first being that there was no conspiracy for the following reasons: CBS–TV was not a separate entity but only a division of CBS, and therefore there could be no conspiracy between the two; Holt, the cover man in securing the option and purchase of WOKY, "had been given the particular job" by CBS and therefore was not a conspirator; and Bartell never shared in any illegal purpose that would bring him into the conspiracy. Secondly, in any event, the only issue in the case is the legality of the cancellation of the affiliation agreement by CBS which was merely the legal exercise by CBS of "the normal right of a producer to select the outlet for its product." And, finally, the monopoly charges are entirely "frivolous." The trial judge accepted the second defense.

## III.

It may be that CBS by independent action could have exercised its granted right to cancel WCAN's affiliation upon six months' notice and independently purchased its own outlet in Milwaukee. However, if such a cancellation and purchase were part and parcel of unlaw-

ful conduct or agreement with others or were conceived in a purpose to unreasonably restrain trade, control a market, or monopolize, then such conduct might well run afoul of the Sherman Law. See *Times-Picayune Pub. Co.* v. *United States,* 345 U. S. 594, 624–625 (1953); *Eastman Kodak Co.* v. *Southern Materials Co.,* 273 U. S. 359, 375 (1927). Poller alleges and the affidavits, depositions, and exhibits indicate much more than the free exercise by CBS of the granted right of cancellation. A conspiracy is alleged to restrain trade in the Milwaukee television market; to eliminate WCAN from that market; to secure its facilities at depressed prices; and to occupy the UHF band in that market exclusively. The right of cancellation was merely one of the means used to effectuate this conspiracy. Moreover, "in its wider sense" Poller claims that a part of their conspiracy was "to wipe out the most outstanding UHF operator in the country [WCAN] and by wiping him out they destroyed the UHF industry, which was a threat to them, despite their protestations, because of the enormous economic investment they had in VHF."

It is argued that CBS cannot conspire with itself. However, this begs the question for the allegation is that independent parties, *i. e.,* Holt and Bartell, conspired with CBS and its officers.[4] While respondents' affidavits assert that Holt acted in good faith as a special agent or employee for CBS and that Bartell was completely free of any evil motives directed toward WCAN, the trial judge indicated a belief that Holt was "an independent actor" and would have submitted the question of his status to the jury had he not disposed of the case on other grounds. Furthermore, Poller submitted a deposition of Holt, an exhibit to which showed CBS had furnished Holt

---

[4] We do not pass upon the point urged by Poller that under the CBS corporate arrangement of divisions, with separate officers and autonomy in each, the divisions came within the rule as to corporate subsidiaries.

a complete analysis in writing of the Milwaukee market and the ownership and affiliation of the TV stations there, including WCAN. The deposition revealed that Holt had knowledge that the obvious purpose and necessary effect of the plan would be to eliminate independent UHF in Milwaukee and that he had a personal stake in its success. This included, *inter alia,* Holt's statements that he met with top CBS officials in New York for a briefing on his role, that he was a close friend of these officials, and that he would have retained the option for himself if unused by CBS. The latter admissions, when coupled with the uncertainty at that time of a Federal Communications Commission rule permitting CBS to purchase WCAN, suggest that the alternative plan was to let Holt exercise the option and take the affiliation if CBS could not. Likewise, Bartell's affidavit, barely a page and a half in the record, does not negative the allegations of conspiracy. Unquestionably, after knowing that Holt had in truth been acting for CBS and that the sale would prove disastrous to WCAN, he did file certain papers with the Federal Communications Commission requesting approval of the sale of WOKY. Poller had no opportunity to cross-examine him although he was a key witness to respondents' theory of the case. And it is noted that even though the transfer was uncontested before the Federal Communications Commission it received approval by a vote of only three Commissioners with the remaining two strongly dissenting.[5] It might be that on a trial Poller could substantiate his claims of conspiracy even against Bartell, although this would not be necessary to his case.

Respondents' answer to the charge that one of the purposes of the alleged conspiracy was to exert a restraining effect upon the development of UHF is that this is a

---

[5] 11 Pike and Fischer Radio Reg. 913, 914.

"fantastic assumption—for which there is not a shred of evidence." An analysis of the record seems to indicate that in 1954 prior to the purchase of WOKY there were three UHF channels assigned to Milwaukee by the Federal Communications Commission, two of which (WCAN and WOKY) were operating; that since December 1953 CBS had been studying UHF markets preparatory to an expected change in Commission rules that would allow it to purchase two UHF stations in addition to its five VHF ones; that its staff rated Pittsburgh, St. Louis, New Haven-Hartford, and Milwaukee, in that order, as the most attractive; that CBS chose to enter the latter market and buy WOKY rather than to operate in Milwaukee on the third available channel; that WCAN's profitable operation in 1954, even with lower rates and competition from WOKY, was "immediately converted to a losing" one, although in 1955 WOKY was out of business; and that this reported loss of about $130,000 under CBS operation in 1955 contrasted sharply with the 66% increase in its profits nationally. Furthermore, reports in the record from CBS itself show that it always had recognized "a VHF station . . . would be preferable to a UHF . . ." but that the latter had "specially good *short-term* prospects" (emphasis supplied) in Milwaukee because it had "the characteristic of being at present" (1954) a "single station" market. CBS further recognized that since its programing was "already working to build up UHF set population . . . [through WCAN] [t]here would be no short-term loss to the network in continuing to give the support of CBS programing to the buildup of a UHF population . . . *at least until more VHF stations come in.*" (Emphasis supplied.)

The record indicates that Poller had built up a profitable UHF operation, which was recognized as "the most successful" in the United States. Even CBS officials pointed to it as an example of how "a vigorously and

aggressively managed new UHF station in that community can do well." In the short period of a year its public acceptance in Milwaukee was so great that 90% of the 260,000 TV sets in the area had been modified, at an expense of some $20 to each owner, so as to be able to receive UHF signals. While CBS had refused to enlarge the six-month cancellation clause, at no time prior to the alleged conspiracy did it indicate an intention to cancel the WCAN affiliation.[6] It was, Poller claims, only pursuant to the conspiracy that CBS came into the Milwaukee market and eliminated both WCAN and WOKY. Since that time the total number of commercial UHF stations in the United States has steadily declined from 121 at the end of 1953 to 94 by midyear 1956. At the close of 1957 the number was only 88. In 1958 CBS itself abandoned a UHF station in Hartford, and in 1959 the very station in controversy here was likewise abandoned, leaving Milwaukee with no commercial UHF service. Instead, CBS has switched to VHF, affiliating with a Storer Broadcasting Company station which was authorized there the same year. It will be remembered that Mr. Storer is the same prospect who, Poller claims, indicated he would pay $2,000,000 for WCAN when the multiple rule was adopted but who cooled after a CBS warning. All of this may not be sufficient to warrant the finding that Poller contends for on this charge, but it does indicate more than fantasy, particularly in the light of the testimony of CBS Vice President Salant in his deposition that "it would be the kiss of death to UHF if either NBC or CBS abandoned a UHF station."

It may be that upon all of the evidence a jury would be with the respondents. But we cannot say on this record that "it is quite clear what the truth is." Cer-

---

[6] Indeed, such action would be unreasonable in light of the success of Midwest's initial operation and its highly favorable prospects with the expanded facilities and new equipment.

tainly there is no conclusive evidence supporting the respondents' theory. We look at the record on summary judgment in the light most favorable to Poller, the party opposing the motion, and conclude here that it should not have been granted. We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.[7] It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of "even handed justice."

## IV.

Other contentions of respondents are subject to ready disposition. They say that no restraint of trade resulted from CBS' termination of its affiliation with WCAN for this enabled it to support WOKY, the other UHF station in the Milwaukee area, which based upon Poller's own allegations was doomed without an affiliation. To the extent that this argument suggests that there is no violation of the antitrust laws because the public will still receive the same service, it has been foreclosed by this Court's decision in *Klor's* v. *Broadway-Hale Stores,* 359 U. S. 207 (1959). And if it is meant to say that there was no restraint because CBS in canceling its affiliation with WCAN was merely doing what it had a right to do and the resulting demise of WCAN followed from normal market conditions, it erroneously assumes that CBS had an absolute right despite violations of the antitrust laws to exercise its contractual privilege. See Part III, *supra.* A further answer to the respondents' conten-

---

[7] Compare *Kennedy* v. *Silas Mason Co.,* 334 U. S. 249, 256–257 (1948); *Arenas* v. *United States,* 322 U. S. 419, 434 (1944).

tion in this regard is that Poller has an additional claim that part of the conspiracy was the destruction of UHF broadcasting entirely. The sole answer of CBS to that is "there is not a shred of evidence" to support such a charge. However, there has been no trial as yet, and the issue remains a factual one disputed under the pleadings and still undetermined.

CBS contends that the monopolization charges are frivolous. We find the record unclear on these claims. In view of our remand for a trial on the merits, we forego any comment thereon. The complaint does not allege the relevant market involved. In the trial court it was argued that UHF broadcasting in Milwaukee was the market, but on the record here we are unable to determine that issue. It may well be that on a trial appropriate allegations and proof can be adduced showing violations of § 2. See generally *International Boxing Club* v. *United States,* 358 U. S. 242, 249–252 (1959); *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 648–654 (1957) (dissenting opinion). We believe it to be good judicial administration to withhold decision on these issues.

*Reversed and remanded.*

MR. JUSTICE HARLAN, with whom MR. JUSTICE FRANKFURTER, MR. JUSTICE WHITTAKER and MR. JUSTICE STEWART join, dissenting.

As I see it, this is one of those cases, not unfamiliar in treble-damage litigation, where injury resulting from normal business hazards is sought to be made redressable by casting the affair in antitrust terms. I think that the antitrust laws do not fit this case, and that the courts below were quite correct in holding that the respondents were entitled to judgment as a matter of law.

The litigation arises out of CBS' cancellation of an affiliation arrangement with WCAN, a UHF television broadcasting station in Milwaukee, owned by Midwest

Broadcasting Company of whose property Poller is assignee. CBS maintains that such cancellation was but the legitimate exercise of a contractual right. Poller says that it was part of a conspiracy to restrain and monopolize trade in the television broadcasting business, violative of §§ 1 and 2 of the Sherman Act. Suing under § 4 of the Clayton Act,[1] Poller seeks to recover as damages the trebled fair value of the WCAN station and equipment, whose sale to CBS at a distress price he claims was forced upon him in consequence of CBS' cancellation of the WCAN affiliation contract.

Poller asserts that CBS, joined by others as conspirators, wanted to put him out of business as the first step in a grand design to destroy UHF broadcasting in Milwaukee, if not indeed throughout the United States. It is said that CBS looked with disfavor upon the growth of UHF broadcasting, being itself already heavily committed to VHF. As subsidiary steps towards the effectuation of this plan, it is charged that CBS chilled prospective purchasers of WCAN; acquired the only then competing UHF station in Milwaukee, WOKY; and later closed that station down.[2] CBS' co-conspirators are said to have been CBS-Television, an unincorporated division of CBS; certain officers of CBS; Bartell, the then owner of WOKY; and Holt, a management consultant, who at CBS' behest obtained from Bartell an option to purchase WOKY.

I assume that Poller would be entitled to proceed to trial if the record before the District Court had left open

[1] Under 15 U. S. C. § 15 "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws is given a private right of action."

[2] The last of these allegations was not included in the complaint since the station acquired by CBS did not cease operations until after this suit was brought. It was alleged, however, in petitioner's supplemental affidavit in response to the motion for summary judgment.

a genuine question of fact as to whether the alleged conspiracy had as its object the elimination of all UHF stations in the Milwaukee area, or even if it appeared that petitioner might prove that the respondents entered upon this course in order to reduce the number of UHF stations in Milwaukee from two to one, which was to be owned outright by CBS.[3] But, for reasons given below, I think that the depositions and affidavits which were before the District Court disclosed to a practical certainty that such proof could not be made.

What did remain open to proof was an alleged arrangement among CBS, its television division, and its officers and agents whereby CBS canceled an affiliation with one UHF station and purchased the facilities of a competing station. Even if somewhere among those sought to be drawn into petitioner's net there can be found two independent actors whose meeting of minds would satisfy the usual conspiracy requirement of "plurality of parties,"[4] their agreement to carry out that design would not, in my

---

[3] If such issues of fact were open and petitioner could prove at the trial that respondents' motives were unlawful, I think it would still be incumbent upon him to prove that the disaffiliation of WCAN was part of the illegal scheme. There is evidence in the record, not contradicted, tending to show that CBS would have canceled that affiliation without regard to its purchase of the Bartell station. If so, much, if not all, of petitioner's alleged loss would have been incurred because of this unilateral act, and not "by reason of anything forbidden in the antitrust laws."

[4] While I do not reach respondents' contention that no consensual arrangement of any kind was shown, I must say that the Court has stretched very far in suggesting that Holt may have been a "conspirator." The record shows, beyond any real possibility of contradiction, that Holt was simply engaged by CBS to act for it, as undisclosed principal, in procuring from Bartell an option to purchase WOKY. So far as Bartell is concerned, it stands uncontroverted in the record that he never knew of CBS' interest in Holt's option until it was exercised by CBS.

view, of itself offend anything proscribed by §§ 1 or 2 of the Sherman Act.

## I.

In passing on the motion for summary judgment, the District Court had before it more than the four affidavits of interested parties to which the Court's opinion seems especially to refer (*ante,* pp. 468, 473). In the record was the testimony of four key witnesses taken by pretrial depositions. Petitioner's counsel had examined Frank Stanton, President of CBS; Richard Salant, a Vice-President of CBS; and Thad Holt, who acted for CBS in procuring the option on the Bartell station.[5] Petitioner's testimony was also in the record in the form of a deposition taken by respondents' counsel, and two affidavits submitted in opposition to the motion for summary judgment. In addition, the record contained the respondents' answers to written interrogatories put by the petitioner. It is in light of this far from meager pretrial discovery that the appropriateness of summary judgment must be evaluated.

Federal Rule of Civil Procedure 56 (c) authorizes a District Court to enter summary judgment

> "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In so providing, the draftsmen of the Rule of course did not intend to cut off a litigant's right to a trial before the appropriate fact-finder if triable issues remained unresolved after the pleadings were closed and pretrial dis-

---

[5] The record shows that the undisclosed employment of Holt was due to CBS' desire to keep its competitors, particularly the National Broadcasting Company, from knowledge of its intentions respecting WOKY. This is, of course, a perfectly normal business phenomenon.

covery had. *Sartor* v. *Arkansas Natural Gas Corp.*, 321 U. S. 620, 627; *Fountain* v. *Filson*, 336 U. S. 681. On the other hand, it is equally clear that their purpose was to obviate trials which would serve no useful purpose. In administering the Rule, the availability of pretrial discovery, as well as matter actually discovered, is a factor to be considered in determining whether a "genuine issue as to any material fact" is open. *E. g., Schneider* v. *McKesson & Robbins, Inc.*, 254 F. 2d 827, 831. Further, the Rule does not indicate that it is to be used any more "sparingly" in antitrust litigation (*ante*, p. 473) than in other kinds of litigation, or that its employment in antitrust cases is subject to more stringent criteria than in others. On the contrary, without reflecting in any way upon the good faith of this particular lawsuit, having regard for the special temptations that the statutory private antitrust remedy affords for the institution of vexatious litigation, and the inordinate amount of time that such cases sometimes demand of the trial courts, there is good reason for giving the summary judgment rule its full legitimate sweep in this field.

In this case petitioner, the party opposing the motion, had complete access by means of pretrial discovery to all the evidence he could marshal at a trial on the merits.[6] Neither his cross-examination of hostile witnesses nor his own direct testimony by way of deposition and affidavit produced any evidence which would indicate that the respondents sought to accomplish anything more than to purchase for CBS a UHF station in Milwaukee. As the Court's opinion seems to recognize, such a purchase (accompanied by a cancellation of petitioner's station affiliation) would be unlawful only if "*conceived in a purpose* to unreasonably restrain trade, control a market, or

---

[6] There is no suggestion that petitioner was not afforded opportunity to examine any witness he wanted, either before or after respondents made their motion for summary judgment.

monopolize." (*Ante*, p. 469.) (Emphasis added.) In other words, unless a purpose to cancel petitioner's affiliation and purchase the Bartell station would, by itself, be unlawful, petitioner could prevail in this suit only if he proved that the respondents *intended* to stifle competition in, or monopolize, television broadcasting, either by closing down his station or, more broadly, by destroying the UHF business in whole or in part.[7]

This crucial issue, therefore, turns on proof of the respondents' motives. Had petitioner proceeded to trial and introduced no more evidence of motive than was

---

[7] The assertion that respondents sought to destroy "the UHF industry . . . because of the enormous economic investment they had in VHF," upon which the Court relies (*ante*, p. 469), was not made in any of the papers filed with the District Court. It was first raised during oral argument on the motion for summary judgment. There is nothing in the record to support this charge except the hindsight inference arising from the fact that after *four* years of operating the UHF station in Milwaukee, CBS discontinued it, claiming that the VHF competition was too powerful.

The Court's opinion takes out of context certain statements in a CBS report and infers from them that CBS was intending to make only a short-term venture out of its UHF purchase. But a full reading of the report in question, which was appended to petitioner's affidavit in opposition to the motion for summary judgment, reveals that CBS rejected the suggestion that it purchase a UHF station in a market that was primarily VHF, for the very reason that it would have only short-term advantages. Moreover, the Court's construction of the passage on which it relies hardly reflects its real meaning. The central question on which the report focused was "the degree of short-term cost and inconvenience that is to be undergone in order to obtain the eventual gain" in the purchase of a UHF station. In this context, the report noted that CBS television programs, broadcast by a CBS affiliate in the area (*i. e.*, WCAN), had already built up a UHF viewing market, so that the losses that might be expected at the outset of any such venture would be minimized. The inference is that it would be wise for CBS to capitalize on this headstart before it was cut into by more VHF stations, not that CBS should purchase the station and abandon it as soon as other VHF stations entered the market.

revealed by the pretrial depositions and affidavits, the case, in my opinion, could not well have been permitted to go to the jury. There being no extrinsic evidence of an unlawful purpose, and CBS' executives having unequivocally denied any purpose to eliminate petitioner as a competitor, the jury would be left with no affirmative evidence of any intent to restrain trade. The possibility that the jury might disbelieve the respondents' assertions of innocence is not enough to forestall the entry of summary judgment in their favor. *Dyer* v. *MacDougall,* 201 F. 2d 265..

Despite the ample opportunity afforded him by the availability of pretrial discovery procedures, petitioner, as will be shown, was able to produce no evidence to support his charges that a conspiracy, narrow or far-reaching, had been hatched. He should not be permitted to proceed to trial just on the hope that in the more formal atmosphere of the courtroom witnesses will revise their testimony or that a clever trial tactic will produce helpful evidence. Courts do not exist to afford opportunities for such litigating gambles. See *Radio City Music Hall Corp.* v. *United States,* 135 F. 2d 715; *Schneider* v. *McKesson & Robbins, Inc., supra;* cf. *Orvis* v. *Brickman,* 90 U. S. App. D. C. 266, 270, 196 F. 2d 762, 765–766; *Lavine* v. *Shapiro,* 257 F. 2d 14, 20–21.

## II.

I find nothing in this record to support a claim that CBS, in proceeding as it did, was actuated by a desire to restrain or monopolize trade.

It appears from questions asked of Stanton and Salant, two CBS officers, that petitioner sought to imply an unlawful motive to destroy competition from CBS' failure to negotiate with him in the first instance for the purchase of WCAN. Were it shown that respondents refused to consider purchasing petitioner's instead of Bartell's station, although the former was available on satisfactory

terms, such a showing might be some evidence of an intent to eliminate petitioner as a competitor of the other station bought by CBS. But the record shows that respondents throughout insisted that their refusal to deal with petitioner was the result of information that he had placed an exorbitant price on his station. That insistence, which Poller did not controvert or himself impugn, is confirmed by his own computation of damages in this case, as well as by his deposition testimony which reveals that he valued the WCAN property at $2,000,000 and demanded that price of all interested purchasers. CBS bought the Bartell station, although to be sure it had substantially inferior facilities, for $335,000.

Nor is there any evidence in the record to indicate that the respondents anticipated petitioner's offer to sell his facilities to CBS. It is clear from the affidavits and depositions, and is, in fact, conceded in petitioner's brief before this Court, that it was petitioner who initiated the negotiations and "importuned CBS to take his equipment off his hands." Petitioner contends that the respondents knew he would have no use for the recently enlarged plant once his CBS affiliation was canceled, so that his offer of sale was a necessary consequence of the disaffiliation. But this proves only that petitioner's injury may as readily have been the result of CBS' lawful program of expansion as of an invidious scheme to restrain competition. It buttresses the conclusion reached by the Court of Appeals (109 U. S. App. D. C. 170, 173, 176, 284 F. 2d 599, 602, 605) that the diminution in the value of petitioner's property was attributable to petitioner's imprudent investment [8] rather than to any antitrust con-

---

[8] The record shows that Poller from the beginning had unsuccessfully tried to persuade CBS to enlarge the term of his affiliation contract cancellation clause from six months to two years, and that, with eyes thus open, he nonetheless proceeded with his substantial equipment investment.

spiracy by the respondents. In addition, petitioner's surmise that the respondents must have known that the cancellation of Poller's affiliation would result in his offering his equipment to CBS is hardly consistent with the fact, sworn to by Salant and never traversed, that CBS had its engineering department draw up complete plans as to how the Bartell facilities could be expanded to make them suitable for CBS' intended use.

Finally, it is entirely clear from the record that petitioner was unable to prove that the respondents' motive was to eliminate his station. It is undisputed that at the time Holt obtained the option on the Bartell station both the American Broadcasting and DuMont networks had no primary affiliates in the Milwaukee market. There is nothing to indicate that respondents should have anticipated at the birth of their alleged conspiracy that such affiliations would be unavailable to petitioner if the CBS tie were broken. Moreover, it is patent from the terms of the contract under which CBS purchased petitioner's equipment that petitioner represented to the respondents that he would continue broadcasting operations as an independent from the studio formerly occupied by Bartell.[9] It was only after this representation was made, albeit, as petitioner now claims, with only "about a 5 per

---

[9] One of the introductory clauses of the contract provided:

"WHEREAS, Midwest [petitioner] has represented to CBS that Midwest intends to continue the operation of WCAN and all business incidental thereto, and for that purpose CBS proposes to make the sale and transfers hereinafter set forth; . . ."

I find no persuasive basis in the record for petitioner's assertion that this was designed as a self-serving declaration to cloak CBS' alleged antitrust malefactions. By that same contract CBS sold to Poller the WOKY equipment, in part consideration for the purchase of his equipment, the thought quite evidently being that such equipment would suffice for his continued operations, while the superior WCAN equipment would relieve CBS from the necessity of completely re-equipping WOKY.

cent hope" that he would be able to continue, that the exchange of facilities was consummated. The transaction was in all ways consistent with the parties' written intention to maintain *two* operating UHF stations in Milwaukee. For it was surely much more likely that petitioner could survive as an independent by using the smaller Bartell plant than by remaining in his enlarged studio, which had absorbed a large amount of capital that could not, at least immediately, be put to fruitful use.

In sum, the District Court had before it on this motion for summary judgment a record on which it was apparent that petitioner could prove only that CBS had undertaken to cancel its affiliation with petitioner's station and, with Holt's assistance, to purchase a competing UHF station. Only if such a "conspiracy" is prohibited by § 1 or § 2 of the Sherman Act should the petitioner have been permitted to proceed to trial.

### III.

Respondents freely admit that the purchase of the Bartell station and the cancellation of petitioner's affiliation were parts of one course of action. They maintain, however, that their intention was to purchase a UHF station in Milwaukee as the first step in an incipient program of expansion into the UHF market, made possible by the Federal Communications Commission's then recently adopted "5-and-2" amendment to its multiple-ownership rule. By reason of this amendment, a single licensee was permitted to own two UHF stations in addition to the maximum five VHF stations theretofore allowed. I would hold that an arrangement to attain this objective did not, of itself, violate § 1 of the Sherman Act.

It must be obvious that the cancellation of an affiliation agreement by one network, not acting in concert with any other, does not alone give rise to a cause of action under the antitrust laws. *Federal Broadcasting System, Inc.,*

v. *American Broadcasting Co.,* 167 F. 2d 349.   A network is surely free to cut its ties to one station and affiliate with another in the same market.   Such an act is analogous to a manufacturer's transfer of an exclusive distributorship from one dealer in the market to another.   This freedom to choose with whom one deals is preserved under the antitrust laws not only because it is a unilateral decision, but because it does not amount to an unreasonable restraint of trade in any meaningful sense of the term, cf. *Packard Motor Car Co.* v. *Webster Motor Car Co.,* 100 U. S. App. D. C. 161, 243 F. 2d 418; *Fargo Glass & Paint Co.* v. *Globe American Corp.,* 201 F. 2d 534.

To overcome these apparent barriers to any holding that § 1 of the Sherman Act was here violated, petitioner suggests two theories under which respondents' conduct might constitute a forbidden restraint of trade: (1) That by reason of the "leverage of its network power" CBS was able to restrain trade among the independently owned UHF stations in the Milwaukee area; and (2) that CBS' purchase of a television station amounted, *per se,* to an unreasonable restraint of trade.   How either of these alleged restraints, assuming they are unlawful, caused petitioner's alleged loss is left a mystery.   Regardless of any question of causation, however, petitioner can prevail on neither theory.

To the extent that the "leverage" complained of charges CBS with monopolizing a market, petitioner's claim falls under § 2, a matter to which I will revert in a moment. *Infra,* pp. 485–486.   Apart from monopoly power, the respondents could have violated the antitrust laws only by conspiring in some manner to use CBS' "leverage" to restrain trade.   Clearly, the disaffiliation alone was not an unlawful use of the network's power.   Having built up the value of his station substantially because of its CBS affiliation, petitioner is hardly in a position to claim that by depriving him, in the exercise of a contract right, of

the benefit of such an affiliation CBS was unreasonably exercising its superior power to restrain trade. And there is no indication in the record that this "leverage" in any way affected the purchase price of petitioner's equipment, even were it to be assumed that the respondents foresaw that petitioner would be willing to sell. The charges here are unlike those in *United States* v. *Radio Corporation of America,* 158 F. Supp. 333, reversed, 358 U. S. 334, in which the Government sought to enjoin, as violating § 1, a network's attempt to coerce an independent owner into selling his station to the network under threat of canceling the network's affiliation with other stations under the same ownership. In this case there is no claim made that CBS conditioned the continuation of some network service upon petitioner's consent to sell his equipment, or on his willingness to reduce his price.

Nor can I agree that the contract whereby CBS became a station owner in the Milwaukee market was, in and of itself, a contract in restraint of trade. Petitioner is unable to point to any convincing differences between the vertical integration that is accomplished when a network purchases a station and that which results from an affiliation contract. Moreover, the very contention now being made here by the petitioner has repeatedly been presented to the Federal Communications Commission, and that agency has consistently adhered to the view that network ownership of stations, subject, of course, to the maximum-ownership limitation, is not contrary to the public interest. *E. g., ABC–Paramount Merger,* 8 Pike and Fischer Radio Reg. 541; *St. Louis Telecast, Inc.,* 12 Pike and Fischer Radio Reg. 1289, 1372; *National Broadcasting Co.,* 20 Pike and Fischer Radio Reg. 411, 419.

This Court has also been reluctant to hold that vertical expansion alone can amount to an unreasonable restraint prohibited by § 1 of the Sherman Act. *United States* v. *Paramount Pictures, Inc.,* 334 U. S. 131, 173–174; *United*

*States* v. *Columbia Steel Co.,* 334 U. S. 495, 525. Without of course suggesting that the Federal Communications Commission has authority to alleviate an applicant for a station license from the requirements of the antitrust laws, *United States* v. *Radio Corporation of America,* 358 U. S. 334, in light of the uniform course of decisions by the agency familiar with the field, and in the absence of any indication that this particular purchase *in fact* restrained trade, I think it is clear that petitioner's injury, even if it be assumed partially attributable to CBS' purchase, may not be made the basis of a treble-damage action.

Petitioner's § 2 claim is if anything even more insubstantial. He contends that respondents conspired to monopolize the UHF market in Milwaukee, and perhaps across the country, and that they succeeded in their attempt, at least in Milwaukee. But it is undisputed that the television sets being produced and sold in the Milwaukee area at the time of the alleged conspiracy were all equipped to receive VHF broadcasts and could be adapted to receive UHF signals as well. Thus, any UHF station was necessarily in competition with all VHF stations in the market with respect to both the viewing and the advertising public. Indeed, as the record uncontrovertedly shows, the CBS station ultimately succumbed because the VHF competition was too strong. Since CBS was patently not a monopolist in the Milwaukee market (which included both UHF and VHF), and since there was no allegation that it approached monopoly power in any other market in which petitioner was a competitor, the entry of summary judgment in favor of the respondents on this claim too was eminently correct.

I have gone into this matter at some length because in my opinion the Court's encouragement of this sort of antitrust "enforcement" does disservice to the healthy observance of these laws. I would affirm.