**FORD WHOLESALE COMPANY, INC., OF SAN JOSE, a corporation, Plaintiff,**

v.

**FIBREBOARD PAPER PRODUCTS CORPORATION, State Shingle Co., Inc. and Wholesale Building Supply, Inc., Defendants.**

Civ. No. 45977.

United States District Court, N. D. California.

Oct. 20, 1970.

Alioto, Blecher & Collins, San Francisco, Cal., Hansen & Dolle, Victor R. Hansen, Richard A. Barich, Los Angeles, Cal., for plaintiff.

Burnhill, Rode, Moffitt & Moore, Oakland, Cal., for defendant Wholesale Building Supply, Inc.

Brobeck, Phleger & Harrison, San Francisco, Cal., for defendant Fibreboard Paper Products Corp.

*Order Denying Certain Defendants' Motion for Summary Judgment*

GERALD S. LEVIN, District Judge.

### I. *Introduction*

This is an antitrust action arising from a Complaint filed herein on November 10, 1966. Plaintiff is affiliated with Ford Wholesale Company, Inc. of El Monte, California and Ford Wholesale Company, Inc. of San Diego, California, the principal business of all of which entities is the marketing and distribution of roofing products and other building materials. Plaintiff and its affiliates were wholesale distributors of defendant Fibreboard's PABCO roofing products prior to January 31, 1964. Plaintiff commenced wholesale distribution of PABCO in September of 1961 and sold such material in Santa Clara, Alameda, San Francisco, Contra Costa, Monterey and San Mateo counties.

Defendant Fibreboard is a Delaware corporation which manufactures and sells its PABCO products throughout California and other states. The other two named defendants are California corporations whose principal business at the times here pertinent was the marketing and distribution of roofing products in the San Francisco Bay Area. These latter two defendants, Wholesale Building Supply, Inc. and State Shingle Company, Inc., were among the 15 local distributors of PABCO products in 1963.

PABCO distributors were free to sell to any customer in any area that they wished. No distributor had an "exclusive" territory, and Fibreboard would deliver directly to retail customers through full load or drop shipments at its distributors' direction in any area. PABCO sold its roofing material FOB its plant, and title to the material passed when placed on the trucks at the plant.

In 1963 plaintiff had warehouses in San Francisco and San Jose. Defendant Wholesale Building had warehouses in Oakland and Contra Costa, and defendant State Shingle had warehouses in Oakland, Contra Costa and San Jose. Another PABCO distributor, Pacific Cement and Aggregate, also had warehouses in Oakland, Contra Costa, San Jose and San Francisco, with the result being five East Bay warehouses, but none operated by plaintiff.

Plaintiff claims that by early 1963 its large accounts in the East Bay area had grown to such a size that their servicing requirements could no longer be properly satisfied from plaintiff's warehouses in San Francisco and San Jose. Plaintiff announced that it intended to open an Oakland warehouse to give better service to its large East Bay drop-shipment accounts. This plan was communicated to Fibreboard, but Fibreboard apparently was unwilling to promise in advance that it would stock such an Oakland warehouse.

On or about September 10, 1963, a meeting was held with Fibreboard and its Bay Area PABCO distributors for the purpose of discussing replacement of PABCO's District Manager by Fibreboard and the temporary short supply of PABCO products available in a new Fibreboard plant in Martinez. Present were representatives of defendants Fibreboard, State Shingle and Wholesale Building, plaintiff and one other Bay Area PABCO distributor. Although it is not altogether clear what was said at that meeting, it appears that the representatives of State Shingle and Wholesale Building indicated that there should be no additional PABCO

outlets in the East Bay and that the representative of Wholesale Building said he would consider discontinuing PABCO if its distribution by others were increased in the East Bay.

On September 20, 1963, plaintiff signed a lease on a warehouse in Oakland with occupancy to begin in early October of 1963. When plaintiff subsequently placed orders with Fibreboard for a shipment of materials to the new Oakland warehouse such orders were returned with a statement that they would not be filled. A Fibreboard representative said that it could not sell PABCO products for plaintiff to stock in its Oakland warehouse. Plaintiff was told, however, that Fibreboard would continue to drop-ship orders sold in the East Bay.

When it became clear to plaintiff that it could not directly stock the Oakland warehouse, it did so indirectly by diverting several shipments that had been initially ordered for East Bay customers of plaintiff and had these shipments placed in its Oakland warehouse. When the Fibreboard representative learned of this diversion, he stated that it "would raise Ned" with State Shingle and Wholesale Building. When the Wholesale Building representative learned of the diversion, he immediately inquired of Fibreboard whether any changes had been made in its distribution system. A Fibreboard salesman recalled that the State Shingle representative hinted to him at this time that if plaintiff were permitted to sell PABCO products from its Oakland warehouse, State Shingle might be forced to switch over its accounts to another line of roofing materials.

Fibreboard again informed plaintiff that it could not sell in the East Bay from its Oakland warehouse. Plaintiff thereupon removed the material stored in the Oakland warehouse and shipped it to its San Jose warehouse.

In early October of 1963, when plaintiff realized that Fibreboard would not waver from its refusal to permit plaintiff to stock its Oakland warehouse, the president of Ford Wholesale Company, Inc. of El Monte (the sole distributor of PABCO products in Southern California) told the Fibreboard representative that if Fibreboard would not sell to plaintiff in the East Bay, the El Monte affiliate might cut off Fibreboard in Southern California.

Thereafter, Fibreboard began to recruit new distributors for its roofing products in Southern California and demanded that all of the Ford Wholesale entities become current as to each of their accounts. By late October, plaintiff was required to have all of its accounts current on a daily basis as of December 10, 1963. On October 29, 1963, the Fibreboard representative notified Ford Wholesale that it would no longer be a distributor of Fibreboard's products in Northern California as of December 31, 1963; and in Southern California and parts of Arizona as of January 31, 1964, pursuant to a written distributorship agreement of October 22, 1962. On December 11, 1963, because of claimed discrepancies in payment, Fibreboard put Ford Wholesale on a COD basis.

Pursuant to the above series of events, plaintiff filed a Complaint alleging violations of the Sherman Act. More specifically, it was alleged that the defendants entered into a contract, combination or conspiracy in restraint of trade by agreeing to exclude, eliminate and restrict competition in the marketing and distribution of PABCO products in California; by preventing plaintiff from having access to an open market for the supply and purchase of PABCO roofing products; by boycotting plaintiff and thus preventing it from purchasing PABCO products; by refusing to deal with plaintiff; and by engaging in other specified practices which undermined and destroyed plaintiff's business.

On July 28, 1970, defendant Fibreboard and defendant Wholesale Building moved for summary judgment in their favor.

## II. *Discussion*

The gist of plaintiff's Complaint is that there was a combination or conspiracy to restrain trade by limiting plaintiff's ability to purchase and sell PABCO roofing products. Defendants' motion for summary judgment is based on the contention that there is insufficient evidence from which a jury could infer the existence of a combination or conspiracy among the defendants, that the defendants did not engage in any conduct in restraint of trade, and that even if the defendants did engage in conduct in restraint of trade, such conduct does not amount to a violation of the antitrust laws under the applicable case authority.

Defendants claim that the open conduct of defendants and the existence of logical reasons for their conduct negates the change of combination or conspiracy. If, however, a jury believed all the evidence alluded to by plaintiff, it *could* reasonably infer that the defendants had combined or conspired, if tacitly, to restrict distribution of PABCO products to the five warehouses then operative in the East Bay in 1963 and thus exclude plaintiff as well as to restrict plaintiff's territories of distribution.

On the issue of restraint of trade, defendants first contend that the decision of Fibreboard not to stock plaintiff's Oakland warehouse was due solely to legitimate business reasons. The business reasons adduced are that (1) Fibreboard regarded the East Bay market as saturated in 1963 and thus determined it would be preferable not to have another of its distributors operate through a warehouse there, and (2) that because of plaintiff's deteriorating credit position Fibreboard was forced to take certain action, including the refusal to stock the Oakland warehouse, to insure current payment to itself during 1963.

Defendants rely heavily on Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969) to support their contentions that the facts of this case could not support the finding of any violation of the antitrust laws and that their alleged business motivations insulated them from any such possible liability. In *Hawaiian Oke* the court refused to find a *per se* violation of the antitrust laws where certain liquor manufacturers conspired to deprive a distributor of his exclusive franchise and to cause it to be transferred to another, even where this meant the destruction of the business of the first distributor. The court noted that,

Plaintiff did not assert that defendant's primary purpose was either to put plaintiff out of business, or to compel plaintiff to conform its conduct to any anti-competitive objectives of the defendants. It offered no evidence to support either of such possible theories; it offered no instructions to support either of such possible theories. *Id.* at 74.

The present case is distinguishable because here plaintiff *has* alleged an anticompetitive motive as the main animating force behind the defendants' actions, namely the pressure brought to restrict East Bay distribution of PABCO products to the five warehouses already operative and to "punish" the plaintiff for refusing to abide by the decision of Fibreboard not to stock plaintiff's Oakland warehouse.

Plaintiff argues that the business reasons advanced by Fibreboard to support its actions are not legitimate and amount to a mere coverup for anticompetitive activity. Fibreboard's "saturation" rationale seems to run counter to two facts: first, Pacific Aggregate and Cement, a large East Bay distributor of PABCO products, was phasing out its business at the times here pertinent; second, Fibreboard admits that it was willing to let plaintiff make as many full-load or split-load drop shipments to the East Bay as plaintiff could sell.

Fibreboard's "credit deterioration" argument is based on a claim that by

the middle of 1963 the credit position of plaintiff and its affiliates had degenerated to the point where they owed Fibreboard over $1,000,000. By the end of 1963, their accounts with Fibreboard were delinquent in excess of $600,000. and so Fibreboard decided that any future sales had to be on a COD basis. Thereafter, Fibreboard obtained judgments against plaintiff and the other Ford Wholesale entities amounting to several hundreds of thousands of dollars.

The weakness in Fibreboard's "credit deterioration" argument is that Fibreboard fails to recognize a distinction between the various Ford Wholesale entities reflected in its own books. Fibreboard did not consider all the Ford Wholesale entities as one for accounting purposes, and the credit position of those entities other than plaintiff is not relevant to Fibreboard's claimed business reasons for its treatment of plaintiff. Moreover, Fibreboard's judicial collection of certain amounts owing is misleading since the total recovered from plaintiff was only $12,500.

While this court does not purport to make a conclusive finding as to the actual motives for Fibreboard's conduct, it is certainly possible that a jury could conclude that the reasons advanced by Fibreboard to justify its actions were not merely the exercise of sound business judgment but ostensible grounds to disguise anticompetitive conduct.

At least two Supreme Court cases tend to support plaintiff's position that an antitrust violation could be made out on the facts present here.

In United States v. General Motors Corp., 384 U.S. 127, 146–147, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), the Supreme Court summarized other earlier cases as standing for the proposition that it was a violation of the antitrust laws for businesses to act in concert for the purpose of depriving others of access to merchandise which they desire to sell to the public.

In United States v. Arnold, Schwinn & Co., 388 U.S. 365, 382, 87 S.Ct. 1856, 1867, 18 L.Ed.2d 1249 (1967) the Court concluded that,

> Once the manufacturer has parted with title and risk, he had parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred—whether by explicit agreement or by silent combination or understanding with his vendee—is a *per se* violation of § 1 of the Sherman Act.

The plaintiff's contention here is that through agreement, Fibreboard refused to allow plaintiff to stock its Oakland warehouse, thus denying to plaintiff the right to sell goods to which it held title in a territory in which it wished to sell on an equal basis with other distributors in that area.

As defendants correctly point out, both *General Motors* and *Arnold Schwinn* are cited and distinguished in the *Hawaiian Oke* case, but this court is of the opinion that those cases still provide a basis for possible recovery by the plaintiff—at least against a motion for summary judgment.

The soundness of plaintiff's position is not now in issue. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a party moving for summary judgment has the burden of showing the absence of a genuine issue as to any material fact, and the material lodged must be viewed in the light most favorable to the opposing party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). *See also* Apple Valley Bldg. & Develop. Co. v. Bonanza Air Lines, Inc., 423 F.2d 661, 662 (9th Cir. 1970). In Poller v. Columbia Broadcasting, 368 U.S. 464, 467, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), the Supreme Court indicated that summary procedures were to be used sparingly in complex antitrust litigation where motive and intent play leading roles. While the present case cannot fairly be described as complex, it is indisputable that determinations

of motive and intent *do* play a leading role.

Accordingly, the motions of defendants Fibreboard and Wholesale Building for summary judgment in their favor are denied.