**IOWA 80 GROUP, INC. & SUBSIDIARIES (Formerly Iowa 80 Truckstop, Inc. and Subsidiaries) Plaintiff,**

v.

**UNITED STATES of America Defendant.**

No. 3:00–CV–90217.

United States District Court, S.D. Iowa, Davenport Division.

June 4, 2004.

Affirmed, 406 F.3d 950.

Bruce Bernard Graves, Brown Winick Graves Gross Baskerville & Schoenebaum PLC, Des Moines, IA, John S. Gosma, Gosma & Gallagher PLC, Gene H. Snapp, Jr., Davenport, IA, for Plaintiff.

Andrew T. Pribe, Joan Stentiford Ulmer, U.S. Dept of Justice, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

The Plaintiff, Iowa 80 Group, Inc. ("Iowa 80") brought this action against the United States for a taxpayer refund pursuant to 26 U.S.C. § 7422. The United States now moves for summary judgment and as explained below, the motion is granted.

### I. Factual Background

Through its subsidiaries, Iowa 80 owns truck stops in Walcott, Iowa and Joplin, Missouri. The Walcott, Iowa facility consists of several buildings including the Main Building, a building referred to as the Old Headquarters Building, a Fuel Center, a Truckomat, and a Service Center. On the first floor of the Main Building, there is a sit-down restaurant, a Wendy's restaurant, Dairy Queen restaurant, a retail store known as the Chrome Shop, public telephones, video games, and public restrooms. The Chrome Shop sells truck replacement parts such as lights, light bulbs, brake lights, straps to use as load controls, fuses, switches, wiper blades, and other minor replacement parts. The first floor also contains what William Moon, Iowa 80's President and CEO, describes in his deposition as a small convenience store, which sells products that range from packaged food and convenience items to automotive-related products such as seatbelt straps, vanity mirrors, air fresheners, motor oil, or windshield wiper blades. Next

to this store are cashiers where customers pay for store purchases or gasoline.

On the second floor of the Main Building, there is a TV lounge, a one screen movie theater that seats approximately forty, twenty two or twenty three individual shower rooms, more public telephones, a coin operated laundromat, a dentist's office, a barber shop, an area used as a chapel, and office space for Iowa 80 employees. There are gasoline pumps adjacent to the Main Building. In addition, there are 16 diesel pumps behind the Old Headquarters Building, which is itself behind the Main Building. There is no designated walkway from the diesel pumps to the Main Building. The diesel pumps are primarily served by a the Fuel Center, which contains a Blimpie's restaurant, public telephones, and restrooms and sells small truck parts as well as snacks and other convenience items.

The Joplin, Missouri installation consists of a Main Building, a Fuel Center, a Truck Wash, a Service Center, and an above-ground diesel fuel tank. There are five gasoline pumps adjacent to the Main Building in Joplin that can serve ten automobiles at once. Customers purchase the gasoline at a cashier station inside the Main Building. The Main Building in Joplin also includes a small movie theater, a retail area selling convenience items, a video game room, a restaurant, public showers, public telephones, a laundromat, a TV room, and office space for Iowa 80 employees. Located across the parking lot from the Main Building in Joplin, the Fuel Center has 12 diesel fuel pumps as well as a retail space selling snacks, sandwiches, and various driver supplies. The Fuel Center in Joplin also contains public telephones and restrooms.

In July 1997, Iowa 80 filed an administrative claim for refund with the Internal Revenue Service (the "IRS") by submitting an Amended Corporate Income Tax Return (Form 1140X). The claim for refund was based on Iowa 80's claim that it was entitled to depreciate the Main Buildings at its facilities in Walcott, Iowa and Joplin, Missouri on a 15–year schedule due to their alleged status as "retail motor fuel outlets." Iowa 80 is currently allowed to depreciate the Main Buildings on a schedule that is over 30 years. In the denial of that claim, the IRS agent assigned to the claim, Steve Kueter, noted that "the taxpayer cannot meet the floor space test based on the amount of the buildings devoted to activities unrelated to petroleum marketing such as restaurants, fast food outlets and other activities mentioned above. It is believed that the taxpayer will not attempt to show that this test could be met."

## II. STANDARD FOR SUMMARY JUDGMENT

Rule 1 of the Federal Rules of Civil Procedure mandates that all Rules, including Rule 56, "be construed and administered to secure the just, speedy, and inexpensive determination of every action." Summary judgment, however, "is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda General Hospital*, 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of the rule is not "to cut litigants off from their right of trial by jury if they really have issues to try," *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming

trials where there is actually no genuine, factual issue remaining to be tried," *Anderson v. Viking Pump Div., Houdaille Indus., Inc.,* 545 F.2d 1127, 1129 (8th Cir. 1976) (citing *Lyons v. Board of Educ.,* 523 F.2d 340, 347 (8th Cir.1975)).

Summary judgment is not a paper trial. "The district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment the Court has but one task, to decide, based on the evidence of record as identified in the parties' moving and resistance papers, whether there is any material dispute of fact that requires a trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); 10 *Charles A. Wright, Arthur R. Miller & Mary Kay Kane* § 2712, at 574–78. The parties then share the burden of identifying the evidence that will facilitate this assessment. *Waldridge,* 24 F.3d at 921.

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Walsh v. United States,* 31 F.3d 696, 698 (8th Cir.1994); *United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir.1990); *Woodsmith Publ'g v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986); *Anderson,* 477 U.S.

at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed.R.Civ.P. 56(c),(e); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of some alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material....Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## III. Discussion

■ In a federal tax refund suit such as this one "it is incumbent upon the claimant to show that the United States has money which belongs to him." *Lewis v. Reynolds,* 284 U.S. 281, 283, 52 S.Ct. 145, 76 L.Ed. 293 (1932); see also *United States v. Pfister,* 205 F.2d 538, 542 (8th Cir.1953). The taxpayer must sustain its burden and show that the initial determination of the IRS was wrong and must show "the essential facts from which a correct determination of his liability can be made." *Roybark v. United States,* 104 F.Supp. 759, 762 (S.D.Cal.1952); see also *Pfister* at 542. As part of this burden, the taxpayer must produce evidence to substantiate all aspects of a claim for refund. *Owen v. United States,* 34 F.Supp.2d 1071, 1073 (W.D.Tenn.1998).

Under the United States Internal Revenue Code, as amended by the Small Business Job Protection Act of 1996, a "retail motor fuels outlet" is classified as a "15-year property," thus a taxpayer may depreciate the cost of that property over 15 years. 26 U.S.C. § 168(e)(3)(E)(iii).

In March 1995, the IRS promulgated a policy statement, also referred to as a "Coordinated Issues Paper" or the "March 1, 1995 ISP Paper" (the "1995 IRS Paper") in which it clarified what structures related to the marketing of petroleum, particularly gas station convenience stores, would receive classification as a property depreciable over the course of 15 years, instead of over 30. The 1995 IRS Paper set forth a two-prong test (the "Two–Prong test") in order to determine whether a building is primarily used in petroleum marketing.

> 1. Is 50 percent or more of the gross revenues generated by the [convenience store] derived from gasoline sales, and
> 2. Is 50 percent or more of the floor space in the building (including restrooms, counters, and other areas allocable to traditional service station "services") devoted to the petroleum marketing activity?

March 1, 1995 ISP Paper. In promulgating this test, the paper also cited "critical factors" that motivate a finding that a gas station convenience store building is not susceptible to the same tax treatment as structures devoted to the marketing of petroleum and petroleum-related products.

> Critical factors in finding that the [convenience store] building is not a service station building are the facts that the [convenience store] does not possess any of the traditional attributes of a service station and that the [convenience store] building is not a special purpose structure. The [convenience store] building is a fully adaptable retail building that competes with other convenience stores and small grocery stores. Competitors

who are not in the oil and gas business provide the same services in similar physical structures.

*Id.* Having discussed these factors, the paper noted that "a building can still be included [as a 15–year asset] if it is primarily used in petroleum marketing." *Id.* Thus, the paper does not seek to assay whether a business operating on the premises of a gas station is a convenience store or a service station building, rather, it seeks to determine whether such a business is "primarily used in petroleum marketing." For this purpose, the paper sets forth the Two–Prong test discussed above. At no point does the paper create a mechanism by which the IRS would or would not classify a business operating on the premises as a gas station or as a convenience store according to the "critical factors" discussion in the paper. Indeed, the statute itself makes clear that taxpayers and the IRS could classify a property as a "retail motor fuels outlet (whether or not food or other convenience items are sold at the outlet)." 26 U.S.C. § 168(e)(3)(E)(iii).

The only guidance Congress provides for the meaning of the term "retail motor fuels outlet" in 26 U.S.C. § 168(e)(3)(E)(iii) is in the Senate Committee Report to the Small Business Job Protection Act of 1996 which modified the Internal Revenue Code.

> The Committee wishes to clarify what types of property qualify as a retail motor fuels outlet.... [P]roperty will so qualify if it meets a 50–percent test. The 50–percent test is met if: (1) 50 percent or more of the gross revenues that are generated from the property are derived from petroleum sales *or* (2) 50 percent or more of the floor space in the property is devoted to petroleum marketing sales. The Committee intends that the determination of whether either prong of this test is met will be

made pursuant to the recent Coordinated Issue Paper. *Property not meeting the test will not qualify as a retail motor fuels outlet....* The Committee intends that, with respect to property placed in service in taxable years that ended before the date of the enactment of the provision, the determination of whether the property meets the 50–percent test generally will be made in a manner consistent with the manner in which the 50–percent test of the Coordinated Issues Paper is applied (but by using the disjunctive test intended by the Committee rather than the conjunctive test of the Paper.)

Senate Committee Report P.L. 104–188 (emphasis added). Thus Congress sought to alter the test promulgated by the IRS in the 1995 IRS Paper only by making the Two–Prong test disjunctive instead of conjunctive. Congress did not see fit to alter the test in any other way, such as narrowing its application to properties that fall within the ambit of the 1995 IRS Paper's preliminary "critical factors" discussion.

In the wake of the 1996 tax legislation and the accompanying legislative history that commented upon the issue of when a property qualifies for depreciation treatment as a "retail motor fuels outlet," the IRS revisited the issue in a second policy paper in April 1997 (the "1997 IRS Paper"). April 2, 1997 ISP Paper. The paper makes the Two–Prong test disjunctive instead of conjunctive. It also removes from the "critical factors" discussion without comment the language to the effect that "[t]he [convenience store] building is a fully adaptable retail building that competes with other convenience stores and small grocery stores. Competitors who are not in the oil and gas business provide the same services in similar physical structures." Finally, the paper clarifies how the IRS and taxpayers should measure the gross revenues that are derived from a property. "Gross revenues should be analyzed on a building-by-building basis. Buildings with multiple businesses should include revenue of all the business activities owned or operated by the owner of the building. Of course, each other building located at the [convenience store] site should be classified according to its primary use." *Id.*

In the case at bar, Iowa 80 initially offered several different bases for its argument that the Main Buildings in Walcott, Iowa and Joplin, Missouri are "retail motor fuels outlets" and are thus entitled to more preferable tax treatment. By Memorandum Order and Opinion filed May 23, 2002, the Court rejected most of Iowa 80's theories and held that the doctrine of variance precluded Iowa 80 from arguing that the Main Buildings satisfy the fifty percent floor space test On October 30, 2003, the Eighth Circuit Court of Appeals affirmed the majority of the Court's opinion, but held that Iowa had properly raised its floor space claim during the administrative proceedings. As such, the court of appeals concluded that the doctrine of variance did not apply and remanded the case so the Court could consider Iowa 80's claim that more than fifty percent of the floor space at the Main Buildings in Iowa and Missouri are devoted to the petroleum marketing activity. The Court now turns to this consideration.

As noted above, the 1995 and 1997 IRS papers state that a building will receive favorable tax treatment if fifty percent or more of the floor space in the building (including restrooms, counters, and other areas allocable to traditional service station services) is devoted to the petroleum marketing activity. In arguing that the main buildings at Walcott and Joplin satisfy the test, Iowa 80 seizes upon the terms "marketing activity," and contends that almost all of the services provided at the two locations are involved in the marketing of

petroleum products. Plaintiff argues that because many, if not most, of its customers are over the road truck drivers, services such as the movie theater, laundromat, barbershop, and trucker's lounge, found on the second floor of the Walcott location, are invaluable components in Iowa 80's marketing of fuel products to truck drivers. Plaintiff further contends that the question of whether these areas are devoted to petroleum marketing is a question of fact for a jury to decide. The Court finds Plaintiff's argument less than persuasive.

From the outset, Plaintiff's argument is seriously undercut by the fact that the relevant standard at issue is whether the areas in question are devoted to the petroleum marketing activity, not whether the space is tangentially related to the marketing activity. The Oxford–English dictionary defines devoted as "zealously attached or addicted to [ . . . ] a cause." *Oxford–English Dictionary* (2nd Ed.1989). Plaintiff argues that the second floor of the Walcott building, as well as the game areas, chrome shop, restaurants and other services are devoted to the marketing of petroleum products, but this cannot be the case. None of the services described are necessary to market and sell petroleum products. Under Plaintiff's theory, a separate business that operated across the street and that offered exactly the same services and products offered at the Iowa 80 truck stops, save gasoline, would not be a competitor of Iowa 80's because Iowa 80 offers these products and services only to sell more gasoline. Conversely, under the same theory, an individual could open a bowling alley with gasoline pumps outside and argue that the bowling alley is there only to provide a service that is necessary to sell more petroleum products. Restated, barbershops, movie theaters, fast food restaurants, video game arcades, gift shops, and laundromats exist across the country without claiming to be devoted to the marketing of petroleum products, and the presence of a fuel pump outside any of these businesses does not change matters. In either case, the result would appear to go well beyond that which was contemplated by the law.

Beyond the hypothetical applications of Plaintiff's theory, the reality of Plaintiff's locations further diminishes its argument. Although over the road trucker drivers may represent a significant portion of Plaintiff's customer base, they are not Plaintiff's exclusive source of revenue. Iowa 80's locations are open to truckers and ordinary travelers alike, yet none would argue that the presence of a barbershop or movie theater is in any way relevant to the sale or marketing of petroleum products to non-trucking consumers. Also, as noted above, the majority of the diesel fuel sales are handled not at the main buildings, but at the Fuel Center. The services offered to truck drivers at the main buildings then, are not directly related to the majority of fuel sales conducted by Iowa 80, much less devoted to the marketing and sale of petroleum products. As such, Plaintiff's argument must fail.

▮ The Court finds that the second floor of the Walcott location is not devoted to the petroleum marketing activity. Without this area, Plaintiff cannot satisfy the floor space test at the Walcott facility under any theory and Defendant is entitled to summary judgment. The same holds true for the Joplin, Missouri location. After disregarding the floor space occupied by the movie theater, arcade, restaurant, showers, laundromat, and tv lounge, Iowa 80 cannot show under any theory, that more than fifty percent of the floor space is devoted to the marketing of petroleum products. Defendant is, therefore, entitled to summary judgment.

## IV. ORDER

Defendant's motion for summary judgment is **granted** with respect to all claims

involving the Walcott, Iowa facility. The United States motion for summary judgment is also **granted** with respect to all claims involving whether the Joplin, Missouri installation is a "retail motor fuels outlet" due to a devotion of 50% or more of its floor space to the marketing of petroleum.

IT IS SO ORDERED.