Albert J. EPPRECHT

v.

**DELAWARE VALLEY MACHINERY, INC., et al.**

Civ. A. No. 74–63.

United States District Court, E. D. Pennsylvania.

Jan. 15, 1976.

J. Freedley Hunsicker, Jr., Philadelphia, Pa., for plaintiff.

Judah I. Labovitz, S. Gordon Elkins, Philadelphia, Pa., Edward Fackenthal, Jr., Norristown, Pa., for defendants.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Before us are motions for summary judgment filed pursuant to Fed.R.Civ.P. 56, by several of the defendants in a case in which plaintiff, Albert Epprecht, accuses various defendants and the corporations with which they are associated of misrepresentations and nondisclosures in connection with the sale of securities in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5 of the Securities Exchange Commission, and the Pennsylvania common law of fraud. Plaintiff's cause of action arises from the events of early 1972 during which time a swirl of events surrounding his financially troubled corporation, Delaware Valley Machinery, Inc., (DVM), prompted him to sell out his entire 94% interest in DVM's capital stock. He now alleges that the various defendants misrepresented or withheld from him the true extent of DVM's backlog of machine tool orders, thereby painting a deceptively gloomy financial picture and inducing him to sell out his interest. Having sifted through the extensive deposition testimony in great detail, we conclude that the motions must be denied.

### I.

DVM was engaged in the business of selling machine tools that had been manufactured by others. It enjoyed the position of exclusive distributor in the Middle Atlantic Region for several national manufacturers, including defendants Dreis & Krump (D&K) and American Tool Works (ATW). Prior to 1972 DVM salesmen would locate customers for the machine tool manufacturers and, upon consummating a sale, the product would be shipped directly to the buyer. The buyer would make payment to DVM, who in turn made payment to the manufacturer, retaining a fixed commission. In a business such as DVM's, where sales performance is indispensable, it is quite apparent that the morale and support of the salesmen is crucial.

Plaintiff Epprecht was at all pertinent times the president of DVM. In addition to his role at DVM, Epprecht was also involved in several other business ventures which took up a considerable amount of his time and energy. Prior to the events of 1972 plaintiff arranged substantial loans from DVM to two of these other businesses, Seaboard and Cybernetics, to the financial detriment of DVM which suffered cash flow problems. Also in early 1972 DVM owed payables in excess of $140,000 to ATW and $70,000 to D&K on machine sales.

On February 1, 1972, a meeting of the DVM Board of Directors was held, and the subject of DVM's financial quagmire dominated the meeting. Present at the meeting was Alidor DeWolf, the president of D&K, who also served as a DVM director. DeWolf, concerned at the outset about repayment of the debt owing D&K, became quite disturbed when he learned of the much larger debt owing ATW, and the failure of Epprecht to present a certified audit of DVM. DeWolf insisted that plans be promptly formulated to restore the corporation's financial health, and that Epprecht provide some security in return for a one year extension for payment of the debt to D&K. Epprecht expressed interest in an arrangement whereby he would give as security to D&K a personal guarantee secured by a mortgage of $50,000 to $70,000 on his personal real estate. At one point during the meeting DeWolf met privately with defendant Daniel Murphy, DVM's chief salesman. According to their account, Murphy requested

the meeting to inform DeWolf of (1) Murphy's belief that Epprecht was mis-managing DVM; (2) the dissatisfaction of the salesmen with Epprecht; and (3) the fact that Epprecht had arranged loans from DVM to other Epprecht-owned enterprises.

DeWolf left the meeting with the impression that DVM was in a most precarious condition. Epprecht was advised by DeWolf to procure a certified financial statement and to keep DeWolf abreast of the situation. Following the meeting DeWolf was driven to the airport by James McCloskey, another defendant who served DVM as vice president. They insist that the subject matter of their conversation was innocent.

On February 29 Epprecht met in Cincinnati with defendant Glen Kraus, the president of ATW to discuss repayment of DVM's $140,000 debt. Kraus suggested that the amount of the debt be reduced to $100,000 immediately and that the balance be repaid over five years. Nothing was resolved at the meeting, and both Epprecht and Kraus flew to Chicago to confer with DeWolf on March 1. DeWolf and Kraus agreed to give DVM an extension of time provided certain preconditions were satisfied. They insisted on a certified financial statement from DVM. They further demanded an opportunity to sound out the attitudes of the DVM salesmen concerning their reactions to DVM's predicament. Moreover, they suggested that plaintiff consider withdrawing from any active role in the management of DVM and that day-to-day management be entrusted to defendant McCloskey. There was no suggestion at the time that Epprecht sell any of his capital stock in DVM. DeWolf and Kraus further required that Epprecht agree to inject more capital into DVM to enhance its survival prospects. The figure discussed was $100,-000, to be derived from loans secured by mortgage of his personal property and from the repayment of loans owed by other Epprecht ventures to DVM. Finally, if all of the above were suitably performed, DeWolf and Kraus promised to speak with the salesmen to reassure them of the renewed viability of DVM. The meeting ended with the understanding that Epprecht would consider the proposal and make a prompt decision. At the time plaintiff apparently deemed the proposal reasonable.

A March 10 meeting was scheduled at which Epprecht, DeWolf, and Kraus were to reach their decision. On the morning of March 10 DeWolf and Kraus held an informal breakfast meeting with the salesmen in the absence of Epprecht. DeWolf claims that to his surprise the salesmen informed him of their uniform decision that under no circumstances would they continue to work for DVM if Epprecht were associated with it. Following the breakfast meeting DeWolf, Kraus, and Epprecht met in the law offices of DeWolf's local counsel. They abandoned their March 1 proposal and offered Epprecht three alternatives: (1) he could do nothing and have DVM thrown into bankruptcy by D&K and ATW; (2) he could relinquish his management duties to McCloskey and become a minority shareholder; or (3) he could sell out his DVM stock entirely in return for a forgiveness of the debts owed to DVM by the other Epprecht-owned enterprises. Plaintiff was given the lunch hour to reach a decision; he decided to sell out entirely.

After the meeting DeWolf, Kraus, and Epprecht's heir apparent, McCloskey, met and discussed with the salesmen the outcome of the meeting. In the days following the meeting Epprecht began to vacillate, trying to devise ways to salvage his role in DVM. He took preliminary steps to acquire additional capital to inject into the company, and he sought to ascertain the status of recent machine tool sales, which he regarded as a barometer of DVM's short-term survival prospects. He received a commitment from a bank to loan a substantial sum of money in exchange for a mortgage on his personal real estate, though the amount promised was far less than the $100,000 that DeWolf and Kraus had mentioned at the March 1 meeting.

DVM employees refused to give Epprecht any information concerning recent orders, and it appeared to him that everybody in the office was under instructions to permit him access to nothing. On March 23 plaintiff arranged a meeting with the salesmen concerning his new plans to revive the company, but they refused to discuss the matter. McCloskey, formerly a close personal friend, became distant.

During this period Epprecht spoke frequently on the telephone with DeWolf who, according to Epprecht, encouraged his efforts to preserve his role in the company and expressed disdain for McCloskey's managerial skills. DeWolf suggested that Epprecht raise the necessary capital and that he drum up support for himself among the salesmen by attempting to arrange for financial inducements that might cause a change of heart. Epprecht and DeWolf also met at a convention in Florida in late March, and DeWolf reiterated his support for plaintiff's endeavors. But throughout this period McCloskey and the salesmen remained aloof and hostile.

On April 5, a meeting was held in the law offices of DeWolf's Philadelphia counsel to resolve finally the fate of Epprecht and DVM. Plaintiff arrived at the meeting harboring a hope of saving his role at DVM. He was troubled by the unwillingness of the salesmen to speak with him and by his lack of access to reliable financial information. When questioned about the backlog of orders McCloskey responded that the backlog was in the area of $1 million, but Epprecht alleges that it was, in fact, in excess of $2 million. Plaintiff presented a plan closely resembling the March 1 proposal to DeWolf and Kraus. DeWolf and Kraus, through their attorney, scoffed at Epprecht's plan as too little, too late, and they refused to entertain serious discussion about it. Presented with the same alternatives as had been suggested at the March 10 meeting. Epprecht chose to sell out completely. The rest of the day was spent negotiating the details of the agreement, which included as consideration for the 94% interest in DVM capital stock a forgiveness of the debts owing DVM by Epprecht's other corporations.

## II.

The gist of plaintiff's claim is that in violation of Rule 10b–5 the defendants failed to disclose or misrepresented the true extent of DVM's backlog of machine tool orders on and before April 5, 1972, thereby inducing plaintiff to sell his stock for less than its true value. There are for practical purposes two groups of defendants both of whom are allegedly involved in the fraud.

■ The first group is the DVM defendants, comprised of the corporation and its officers, salesmen, and office personnel. The second group is the creditor defendants consisting of Alidor DeWolf and D&K on the one hand, and Glen Kraus and ATW on the other. Only the latter group has moved for summary judgment. The material facts pertaining to both DeWolf and Kraus are virtually identical and we shall dispose of these motions together. These defendants are entitled to summary judgment only if they can show that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law.

■ On its face plaintiff's theory of recovery against Kraus and DeWolf is in a peculiar factual posture. Epprecht is claiming that two large creditors of the corporation of which he was both the president and a controlling director are liable to him for damages attributable to misrepresentations and nondisclosure of material financial information concerning the volume of the backlog of orders pending in his own business on the date he sold his interest to other persons. But there are few per se rules precisely defining the range of persons who may sue and be sued for Rule 10b–5 violations; recovery is not predicated on labels so much as the substance of the transactions. Cf. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95

S.Ct. 1917, 44 L.Ed.2d 539 (1975). Judicial construction of § 10(b) has gradually eliminated the requirement of privity as a prerequisite to maintaining an action. Thus liability has been extended to accountants, *Heit v. Weitzen,* 402 F.2d 909 (2d Cir. 1968), cert. denied, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969); bankers, *Carroll v. First National Bank,* 413 F.2d 353 (7th Cir. 1969), cert. denied 396 U.S. 1003 (1970); and attorneys, *Katz v. Amos Treat & Co.,* 411 F.2d 1046 (2d Cir. 1969), who were not the principals in the challenged stock transaction, but who nonetheless played a substantial role in the fraud. There is no sound reason to assume that a creditor of the defrauded seller is immune from Rule 10b–5 liability by virtue of his creditor status alone. Instead we are required to dissect the disputed transaction and to measure the precise role that Kraus and DeWolf played in Epprecht's sale of his interest in DVM against the elements of Rule 10b–5 liability.

### III.

■ In order to hold any of the defendants liable as primary violators of Rule 10b–5, Epprecht must prove that in inducing him to sell his interest in DVM: (1) a particular defendant misrepresented or failed to disclose a material fact; and (2) the action was taken either knowing that the truth had not been communicated or with reckless disregard for the truth.[1] It must be emphasized that liability under Rule 10b–5 is not confined to those direct participants who are primarily liable. Often, when an underlying securities fraud is proven, there are actors on the fringe of the transaction who, depending on the degree of their involvement, may be secondarily liable as either aiders or abettors or as co-conspirators. For example, in this case the plaintiff might prove that some or all of the DVM defendants knew of

the existence of a much larger backlog of machine tool orders pending on April 5, 1972, and that they deceptively sought to conceal it from Epprecht. The fact-finder could infer from the circumstances that, by some combination of an insufficiently blameworthy state of mind and peripheral involvement, the creditor defendants did not share in the DVM defendants' primary liability. Nevertheless, the law permits the fact-finder to conclude that the creditor-defendants were secondarily liable for aiding and abetting or conspiring with the DVM defendants in a securities fraud.

■ Relying on the Restatement of Torts, Section 876(b), the Third Circuit in the recent case of *Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880 (1975), enumerated three elements of proof for imposing secondary liability on the theory of aiding and abetting a securities fraud. In order to prevail on this theory Epprecht must prove: (1) the underlying securities fraud by the primary violators; (2) the creditor defendants knowledge of the underlying securities fraud; and (3) that the creditor defendants rendered substantial assistance to the primary violators in carrying out the securities fraud.

■ Rule 10b–5 liability may also be premised on an even more attenuated relation with the underlying violation where a party participates in a conspiracy to defraud. Like its criminal law counterpart, proof of conspiracy to violate Rule 10b–5 requires a plaintiff to prove both an agreement to do the unlawful act and an overt act in furtherance of the conspiracy. Bromberg, Securities Law § 8.5 (540); *Ferguson v. Omnimedia, Inc.,* 469 F.2d 194 (1st Cir. 1972).

The creditor defendants, Kraus and DeWolf, argue that plaintiff's indiscriminate reference to the "defendants" in

---

1. The law is unsettled in the Third Circuit as to the minimally blameworthy state of mind that will support a Rule 10b–5 damage recovery. What is clear, however, is that actual knowledge that the truth has not been communicated is sufficient. *Thomas v. Duralite Co., Inc.,* 524 F.2d 577, 584 (3d Cir. 1975).

the fraud counts of the complaint is imprecise, that neither Kraus nor DeWolf misrepresented anything relating to the backlog of machine tool orders and that they had no knowledge of or access to such information.[2] They invoke in support of their argument several telling passages of Epprecht's deposition testimony which lend considerable support to their argument at first glance. For example, in his deposition testimony Epprecht admits that none of the creditor defendants made misrepresentations to Epprecht with respect to the backlog of orders referred to in Counts I and II, which form the sole basis of his fraud allegations. (Epprecht deposition, at 64). Indeed he admitted at one point that the word "defendants" in Counts I and II did not in fact refer to either Kraus or DeWolf. (Epprecht deposition, at 130–31).

In addition, there were specific questions designed to elicit from plaintiff the degree of knowledge or other involvement he attributed to Kraus and DeWolf in the fraud. It appears that shortly before the April 5 meeting, plaintiff had compiled a list of machine tool orders which he suspected were pending but not properly reported to him. When he showed the list to McCloskey and Murphy they denied that such orders were pending. In connection with DeWolf's knowledge of the list, the following dialogue transpired:

"Q. Did you ever show the list prior to April 5, 1972, to Mr. DeWolf?

A. No.

Q. Did you ever show that list prior to April 5, 1972, to anyone else at Dreis & Krump?

A. No.

Q. Did you ever discuss that list with Mr. DeWolf or anyone else from Dreis & Krump prior to April 5, 1972?

A. No.

Q. Did you ever tell them that you had such a list?

A. No.

.    .    .    .    .

Q. Do you know whether Mr. DeWolf or anyone else at Dreis & Krump were aware of the items that appeared on your list on April 5?

A. No, I am not aware of it; could have been but I'm not certain.

Q. You have no personal knowledge that they were aware of it, do you?

A. No, not at this point.

Q. Has anyone told you that they were aware of it?

A. No.

Q. Do you know of any conversation between Mr. DeWolf or any other employee of Dreis & Krump and any other person concerning the backlog of DVM on April 5?

A. No . . . except my own assumptions that there had to be conversations.

(Epprecht deposition, at 408–09).

## IV.

Plaintiff has not, in fact, discovered any concrete evidence that either DeWolf or Kraus engaged in any conduct which, when viewed in isolation from the actions of the DVM defendants, would constitute a securities fraud. The creditor defendants argue that by

---

**2.** Count I of the plaintiff's six count complaint charges that:

"the *defendants,* conspiring among themselves and with others [in violation of § 10(b) and Rule 10b–5] employed fraudulent schemes and artifices to induce Epprecht to sell to DVM his 400 shares of DVM stock."

¶ 16 (Emphasis added). Likewise Count II asserts that "*defendants'* conduct constituted fraud and misrepresentation under the laws of Pennsylvania." ¶ 21 The remaining four counts of the complaint have been withdrawn. (Emphasis added).

relying on mere assumptions of their complicity in a scheme to defraud, plaintiff in effect is resisting their motions for summary judgment by relying on the allegations of the complaint. A plaintiff cannot, of course, create a genuine issue as to material facts simply by relying on the allegations of this complaint, Fed.R. Civ.P. 56(e); there must exist a significant factual dispute which is suited to resolution by the fact-finder. *Robin Construction Co. v. United States,* 345 F.2d 610 (3d Cir. 1965).

■■■■■ The law is clear, however, that the moving party bears the burden of proving the absence of a genuine issue of material fact. *United States ex rel. Jones v. Rundle,* 453 F.2d 147 (3d Cir. 1971). That burden is especially heavy on a defendant who seeks summary judgment on the basis that a *plaintiff* has failed to create a genuine factual dispute as to such elusive concepts as motive, intent, conspiracy or knowledge. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Adickes v. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). That the burden on the movant is an onerous one in such cases is demonstrated by *Adickes, supra,* a case in which plaintiff sought to prove a conspiracy between a private storekeeper and the local police to deprive her of her federal constitutional rights in violation of 42 U.S.C. § 1983. Specifically the plaintiff alleged that the storekeeper enforced a policy of not serving patrons in mixed racial company at his lunch counter by conspiring with the police to arrest even those persons who nondisruptively persisted in seeking service. The district court granted summary judgment in favor of defendants because of plaintiff's failure to adduce evidence of the essential agreement element of the conspiracy. The Supreme Court reversed, stating:

> As the moving party, [defendant] had the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the

light most favorable to the opposing party. [Defendant] here did not carry its burden because of its failure to foreclose the possibility that there was a policeman in the Kress store while petitioner was awaiting service, and that this policeman reached an understanding with some Kress employee that petitioner not be served.

398 U.S. at 157, 90 S.Ct. at 1608 (footnote omitted). The moving party was obliged to demonstrate that the policeman was not present in the store, for, so long as there remained the realistic possibility that the policeman was present in the defendant's store, "it would be open to a jury, in light of the sequence that followed, to infer from the circumstances that the policeman and a Kress employee had a 'meeting of the minds' and thus reached an understanding that [plaintiff] should be refused service." 398 U.S. at 158, 90 S.Ct. at 1609.

■■■■■ Plaintiff Epprecht stands on firmer ground than did the plaintiff in *Adickes.* Here there can be no dispute that the creditor defendants have not "foreclosed the possibility" either that an agreement was reached with the DVM defendants which could form the basis of a recovery for conspiracy to defraud or that the creditor defendants had sufficient knowledge of the misrepresented backlog to impose primary or aiding and abetting liability under Rule 10b–5. There were numerous occasions in the months preceding April 5, 1972, when the creditor defendants met privately with the DVM defendants. When viewed together with the considerable evidence that plaintiff has discovered suggesting that DeWolf and Kraus played a crucial role in ousting Epprecht from control of DVM, it is clear that plaintiff is entitled to submit his claims to the fact-finder. It is evident that the DVM defendants and the creditor defendants had a discovered community of interest in restoring the financial health of DVM. To the DVM defendants a healthy DVM ensured continued employment in the machine tool business and enhanced the possibility of personal fi-

nancial security. To the creditor defendants a revived DVM maximized the possibility that the DVM debts would be repaid. Plaintiff has demonstrated that at some point in early 1972, each of the two groups of defendants apparently decided that the most expeditious way to revive DVM was by ridding the company of Epprecht. The possibility that their motives were entirely honorable and supported by legitimate business interests is not a matter that we may properly decide on a motion for summary judgment.

■ Nor is it fatal to plaintiff's case that he can wrest no admissions . of wrongdoing from any of the defendants. It is enough that the depositions portray fertile soil in which the seeds of fraudulent activity could have been planted. The record is replete with admissions by the various defendants of occasions when Kraus or DeWolf met with the DVM defendants in Epprecht's absence. Although all of the defendants steadfastly deny that any culpable conversations transpired, a factfinder could reasonably infer from all of the circumstances that a scheme to defraud Epprecht sprouted and grew out of these private meetings.

As is the case with antitrust actions in which plaintiffs seek to prove intent to monopolize, the proof often is "largely in the hands of the alleged conspirators." *Poller, supra,* 368 U.S. at 473, 82 S.Ct. at 491. The process of ascertaining truth in such instances is advanced "when the witnesses are present and subject to cross-examination [so] that their credibility and the weight to be given their testimony can be appraised." 368 U.S. at 473, 82 S.Ct. at 491. In the only reported securities fraud case directly on point, the First Circuit in *Ferguson v. Omnimedia, Inc.,* 469 F.2d 194 (1st Cir. 1972),

concluded that summary judgment was improperly granted in favor of a defendant-director of a corporation who insisted by affidavit that she was an outside director with no knowledge of the claimed fraud. The defendant, who served the corporation as its. assistant treasurer and secretary, was the wife of the president of Omnimedia who had already been found liable under Rule 10b–5. Terming her role in the scheme "ambiguous," the court recited various circumstances which "give rise to more than a passing inference that she may have known about and participated in any illegal scheme that was afoot to defraud the [plaintiff]." 469 F.2d at 197. Citing *Adickes, supra,* the First Circuit bottomed its decision on the problems peculiar to proving conspiracies observing:

> "In a conspiracy case, agreement is rarely out in the open, and proof of conscious complicity may depend upon the careful marshalling of circumstantial evidence and the opportunity to cross-examine hostile witnesses. As in the present case, summary judgment procedures are often not a sufficient substitute for trial."

469 F.2d at 198 (citation omitted).

We conclude therefore, that plaintiff is not relying on the bare allegations of his complaint in resisting defendants' summary judgment motion, and that, upon viewing the inferences drawn from the underlying facts in a light most favorable to the plaintiff, defendants have not shown the absence of a genuine issue as to any material fact. *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Accordingly, their motions for summary judgment are denied.