340 F.Supp.2d 1017 (2004)
Barry L. JASPER, D.D.S., Plaintiff,
v.
M.H. & B.L. JASPER D.D.S., P.C. PROFIT SHARING PLAN, et al., Defendants.
No. 4:02 CV 00570 SNL.
United States District Court, E.D. Missouri, Eastern Division.
September 30, 2004.
*1018 David V. Capes, Sanford J. Boxerman, Capes and Sokol, St. Louis, MO, for Plaintiff.
Richard J. Pautler, Thompson Coburn, St. Louis, MO, for Defendants.

MEMORANDUM AND ORDER
LIMBAUGH, Senior District Judge.
This matter is before the Court on Defendants', M.H. & B.L. Jasper, D.D.S., P.C. Profit Sharing Plan ("Plan"), M.H. & B.L. Jasper, D.D.S. P.C. ("Corporation"), and Michael H. Edlin, D.M.D. ("Edlin"), (collectively "Defendants"), Motion for Summary Judgment (# 28) and Plaintiffs, Barry L. Jasper, D.D.S., ("Jasper") Cross-Motion for Summary Judgment (# 30). Defendants have asserted a Counterclaim (# 25) in their Answer and have subsequently proposed that "the Court not address the counterclaim unless and until the Court finds that Jasper is entitled to recovery." See Defendants' Response to Plaintiff's Motion for Summary Judgment.
This is an action arising under Employee Retirement Income Security Act of 1974 ("ERISA"), codified as amended at 29 U.S.C. § 1001 et seq., in which Jasper is seeking recovery under an employee profit sharing plan. Jasper filed a five-count complaint on April 22, 2002. On May 13, 2002, Defendants filed a Motion to Dismiss. Subsequently, on June 12, 2002, Plaintiff and Defendants agreed on motion to the dismissal of counts II, III, IV, and V *1019 without prejudice. This Court issued an appropriate order on June 12, 2002, as to the dismissal of counts II, III, IV, and V without prejudice; and stayed proceedings with respect to Count I in order to allow Plaintiff to exhaust his administrative remedies under ERISA. On December 12, 2002, this Court ordered that the notice of Defendants' Motion to Dismiss was deemed moot. Plaintiff reported on December 23, 2002, that his ERISA administrative remedies were in the process of being exhausted. On July 30, 2003, this Court granted the parties' Joint Motion to Extend the Date to Notify Court as to the Administrative Record which was in response to the Court's June 10, 2003, letter directing the parties to amicably agree on the contents of the Administrative Record. Plaintiff filed his First Amended Complaint on October 1, 2003, which essentially is Count I of Plaintiffs original complaint, and noted in it that Plaintiff has exhausted his administrative remedies.[1] Defendants' Answer and Counterclaim was filed on October 24, 2003. On December 4, 2003, Plaintiff filed his Reply to Defendants' Counterclaim. Defendants filed their Motion for Summary Judgment on December 5, 2003, and attached the agreed to Administrative Record as Exhibit A. Jasper filed his Motion for Summary Judgment on December 8, 2003. It has been agreed that this case would be submitted to the Court by way of cross-motions for summary judgment using the agreed and prepared Administrative Record.

Summary Judgment Standard
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett,477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts *1020 in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Butter v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chern. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). With this standard in mind, the Court now examines the facts of this case.[2]

Background

The Parties and the Plan
Jasper, a dentist licensed to practice in Missouri, worked for the Corporation since its inception in 1970. Jasper was the sole shareholder of the Corporation from 1983 through April 1, 1999. (AR 00104). Edlin joined the Corporation as a dentist in 1988. In 1999, Jasper sold his interest in the Corporation to Edlin upon which Edlin became the Corporation's sole shareholder, officer, and director. First Amended Complaint at ¶ 11, admitted by Defendants. Thereafter, Jasper and the Corporation entered into an Employment Agreement, Jasper became a salaried employee of the Corporation, and he served as the sole Trustee and Plan Administrator of the office's pension plan. (AR 00125; AR 0087A-87O).
The Corporation adopted the Plan in 1970 which was amended and restated as of April 1, 1991. (AR 00007). The Plan holds all of its assets in a Trust Fund for the benefit of all of the Plan's participants. (AR 00018; AR 00053-67). Each participant's individual account is known as the Participant's Account. (AR 00008). As of March 31, 2001, the Plan had assets of $2,405,041, and Jasper's account balance was $2,228,501, roughly 92.66% of the Plan's value. (AR 00087-8). The remaining 7.34% of the Plan was held by five other participants including Edlin, the receptionists, and the dental hygienists. See Defendant's Response to Plaintiffs Motion for Summary Judgment at 11; AR 00596.
The "Plan Administrator," which may be the Corporation itself or an individual or committee appointed by the Corporation's Board of Directors, administers the Plan. The Plan Administrator has all powers not specifically reserved to the Corporation, its Board of Directors, or the Trustee (AR 00039).
The rights and duties of the "Trustee" are set forth in the "Trust Document" which also contains details concerning the operation of the Trust Fund. (AR 00053-00067). The Trust Document allows the Plan Administrator to give orders to the Trustee, which must be followed. Additionally, it contains provisions with respect to the resignation of the Trustee and the appointment of a successor Trustee, "[t]he Trustee may resign as Trustee at any time upon written notice to the [Corporation]. Such resignation shall be effective as of the date the Company appoints a successor trustee." (AR 00062).
On June 12, 2001, Jasper tendered a letter stating that he was terminating his employment with the Corporation. (AR 00096K). On July 10, 2001, Jasper wrote and delivered a letter to Edlin stating, "This letter shall constitute notice that as of this date, I resign as Trustee of and as the person appointed to administer the M.H. & B.L. Jasper, D.D.S., P.C. Profit Sharing Plan." (AR 00113). Upon Jasper's resignation the Corporation became the Plan Administrator. (AR 00039-40). Since the Plan states that the Trustee remains as Trustee until a successor is *1021 appointed, Jasper technically remained as Trustee under the Plan until March 18, 2002, despite his purported resignation, because the Corporation designated a successor Trustee when it appointed Edlin to the position on March 18, 2002. (AR 00085.)
Jasper sent the Plan Administrator his Benefit Distribution Election Form (dated June 15, 2001) by certified mail on Thursday, August 2, 2001. (AR 00127). The forms were received by the Plan Administrator on August 6, 2001. Id. Although Jasper claims that "Defendants' attorney admitted that Defendants received the Form on July 2, 2001," the Administrative Record containing that letter actually states, "We are advised that on July 2, 2001, you submitted a distribution request form to the company." Memo, in Support of Plaintiffs Motion for Summary Judgment at 7; AR 000117. The Defendants' attorney does not state that any form was received, but rather that it was submitted. July 2, 2001, is an unusual date because it is after the date of the letter, but before the date on the certified mail return receipt card of Thursday, August 2, 2001. (AR 00127). Additionally, Defendants state that this letter was given to an attorney for the Corporation during unrelated settlement negotiations, Jeff Gershman, who did not represent the Plan. (AR 00134, AR 00136, AR 00145). Therefore, Defendants argue that the letter was not properly submitted to the Plan or Plan Administrator. Id.
The date of Jasper's consent to his benefits disbursement is significant because under the Plan this date dictates when Jasper was entitled to payment. The Plan states, "[A] Participant shall be entitled to payment of his Profit Sharing Benefit ... as follows: The first day of the calendar month that coincides with or next follows the date 60 days after the date the Participant (and his Spouse, if applicable) consent to distribution prior to the normal time provided such date occurs after the Participant's termination of employment." (AR 00026). Defendants determined that Jasper was entitled to disbursement on November 1, 2001.
Around the time Jasper resigned, a dispute arose. In fact, it was "unrelated to Dr. Jasper's Account under the Plan." Plaintiffs Statement of Uncontroverted Material Facts at 2. During negotiations surrounding the dispute, attorneys for Dr. Edlin and the Corporation drafted a settlement offer which stated, "[n]on-cash profit sharing trust assets [in Dr. Jasper's Account] will be valued as of March 31, 2001 as has been the company's consistent practice in the past. While the plan appears to allow discretion to select a "Special Valuation Date" under narrow circumstances, based on the facts available to us at this time, we see no reason to do so." (AR 00114). Obviously, the March 31, 2001, valuation date was not chosen. Instead, the Plan Administrator chose a valuation date of October 1, 2001.
Under the Plan, several provisions are relevant in this case in regard to determining a proper valuation date. First, the Plan in Article II defines valuation date in § 2.52, "`Valuation Date' means the last business day of each Plan Year, and each special date designated by the Administrator under Section 20.4 and agreed to by the Trustee." (AR 00014). Plan Year is defined in § 2.42 as the "12 consecutive month period that begins each April 1 and ends the following March 31." (AR 00013). In the twenty year period that Jasper served as Plan Administrator, March 31st was used as the Valuation Date. (AR 00104). Second, the Plan defines special valuations in Article XX in § 20.4, "Special Valuations. The Administrator may designate a special Valuation Date to avoid prejudice to any Participant *1022 under the Plan. Such special Valuation date shall be treated as a Valuation Date solely for purposes of allocating Trust Fund earnings among the Accounts." (AR 00043).
Counsel for the Corporation in its capacity as Plan Administrator responded to Jasper's request concerning a proper valuation date in a letter dated September 25, 2001. (AR 00117). Due to the inclusion of Defendants' rationale in choosing a special valuation date, that letter is duplicated at length:
Under the terms of the Plan, you are entitled to receive your distribution on October 1, 2001. We are also advised that on July 10, 2001, you submitted your resignation as Trustee of the Plan and as the individual responsible for administering the Plan. Pursuant to Section 8.2 of the Trust Agreement for the Plan, you continue to serve as the Trustee of the Plan until a successor trustee has been appointed. Inasmuch as there has been no successor trustee appointed to date, you are still the Trustee and, therefore, you are responsible for the investment of the Plan assets. We are further advised that to date, sufficient Plan assets have not been liquidated to cover your distribution.
As you are probably aware, the events of September 11, 2001 have had a dramatic impact on the stock market. We are advised that the value of the Plan as of September 21, 2001 is approximately $2,100,000. Thus, if the Plan's assets are liquidated at this time, the proceeds would not be sufficient to cover your account balance as of March 31, 2001 ($2,228,500). Moreover, all other participants' accounts in the Plan would be completely eliminated. Therefore, on behalf of the Company, as plan administrator, we are asking you to consider withdrawing your distribution request and delaying your distribution until the stock market has had a chance to recover from these unforeseen events.
If you do not agree to withdraw your distribution request, the Company, as plan administrator, in order to avoid undue prejudice to the other Plan participants will have no choice but to exercise its right under Section 20.4 of the Plan and designate a "special valuation date". In such event, the Company, as plan administrator, intends to designate October 1, 2001 as the special valuation date. Accordingly, your distribution would be equal to your proportionate share (approximately 92.68%) of the value of the Plan determined as of October 1, 2001.
The letter went on to state that the investment made by Jasper in the Sawgrass Fund can only be redeemed in June of each year without a substantial penalty. Id. Furthermore, the letter stated that if no written agreement from Jasper was received before 10:00 a.m. September 28, 2001, stating that he was withdrawing his distribution request, then the Plan assets would be liquidated (other than the Sawgrass Fund) and that the distribution would be "as soon as administratively practicable." Id. Jasper sent an email on September 26, 2001 to counsel for the Corporation advising them that he did not wish to withdraw his request for distribution. (AR 00490).

The Distribution
On October 1, 2001, counsel for the Corporation advised Jasper's counsel that the Corporation anticipated making a distribution to Jasper sometime late in the first week of October. (AR 00510). After several requests for distribution, the Corporation responded to Jasper on November 21, 2001, that the distribution could not be made until Jasper signed certain documents in his capacity as Trustee. (AR 00510-00511; AR 00532-00535). Jasper *1023 signed the documents on November 26, 2001, and began to receive his distribution.[3] (AR 00557-00563).
Jasper received $2,058,502.23 in Plan benefits beginning in November 2001 using a valuation date of October 1, 2001. (AR 00124; AR 00565-00566; AR 00576; AR 00578). He seeks an additional $172,666.00 under the Plan.[4] Jasper alleges that a valuation date of March 31, 2001, which would have provided him with $2,228,500.00 in total should have been used, that the Defendants' selection of October 1, 2001, as a special valuation date was an abuse of discretion, and that funds should have been disbursed September 1, 2001. (AR 00088; AR 00523).

Discussion
A civil action may be brought by a participant or beneficiary under ERISA "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The first issue for resolution in such a civil action, when a federal court reviews an administrator's decision to deny benefits under an ERISA plan, is the applicable standard of review. The Supreme Court held in Firestone Tire and Rubber Co. v. Bruch, that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefits plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).
The Eighth Circuit Court of Appeals has held that courts should apply a deferential arbitrary and capricious standard instead of a de novo standard in cases in which the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Lickteig v. Business Men's Assurance Co. of Am., 61 F.3d 579, 583 (8th Cir.1995). Where, as in this case, the plan explicitly grants such discretion to a fiduciary, we review the fiduciary's determination for an abuse of discretion. "Under the abuse of discretion standard, `the plan administrator's decision to deny benefits will stand if a reasonable person could have reached a similar decision.'" Leonard v. Southwestern Bell *1024 Corp. Disability Income Plan, 341 F.3d 696, 701 (8th Cir.2003) quoting Woo v. Deluxe Corp., 144 F.3d 1157, 1162 (8th Cir.1998)). The standard requires an evaluation as to the fiduciary's decision which means that "a decision is reasonable if a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision." Jackson v. Metropolitan Life Ins. Co., 303 F.3d 884, 887 (8th Cir.2002) quoting Donaho v. FMC Corp., 74 F.3d 894, 899 (8th Cir.1996) (emphasis in original).
The Eight Circuit has enumerated five factors to examine in order to determine if the administrator or fiduciary acted arbitrarily and capriciously: 1) whether the interpretation is consistent with the goals of the Plan; 2) whether the interpretation renders any language in the Plan meaningless or internally inconsistent; 3) whether the interpretation conflicts with the substantive or procedural requirements of the ERISA statute; 4) whether they have interpreted the words at issue consistently; and 5) whether their interpretation is contrary to the clear language of the Plan. Finley v. Special Agents Mut. Benefit Ass'n., Inc., 957 F.2d 617, 621 (8th Cir.1992). The Eight Circuit has "encourag[ed] district courts to apply all five Finley factors, or explain why a particular factor is inapplicable." Lickteig, 61 F.3d at 583.
Occasionally, a beneficiary may establish facts that warrant a less deferential standard. See McGarrah v. Hartford Life Insurance Co., 234 F.3d 1026 (8th Cir.2000). Both Jasper and Defendants agree that the Court in this case must determine whether the Plan Administrator abused its discretion. See Plaintiffs Memorandum in Opposition to Defendants' Motion for Summary Judgement and Reply Memorandum in Support of Plaintiffs Motion for Summary Judgment at 3^i; Defendants' Memorandum in Support of Their Motion for Summary Judgment at 1. Despite Jasper's general agreement in using the abuse of discretion standard, Jasper has suggested in addition, "that this Court's review of the Defendants' actions herein should be somewhat less deferential due to an obvious conflict of interest on the part of Dr. Edlin, the sole shareholder of the professional corporation."
In order for the Court to apply a less deferential standard in this case, Jasper as the claimant, must present "`material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to h[im]." A plaintiff must also "show that the conflict or procedural irregularity has `some connection to the substantive decision reached.'" Phillips-Foster v. UNUM Life Ins. Co. of America, 302 F.3d 785, 795 (8th Cir.2002) quoting Woo, 144 F.3d at 1160. The need to show a serious breach of fiduciary duty is a considerable hurdle for plaintiffs. Id. In such cases the court applies a less deferential standard along a "sliding scale" tailoring its review to the unique facts of the case under scrutiny. Id.
Jasper has not attempted to satisfy the two-part less deferential standard test as announced in Phillips-Foster and Woo, but has asserted that Edlin as the sole shareholder of the corporation has an "obvious" conflict because every dollar that he could withhold from Jasper increases his own personal account. Jasper urges the Court to not see Edlin as "dispassionate, fair or objective arbiter" but rather to understand that Edlin had a real and substantial incentive to take whatever he could to diminish Jasper's account so that he could keep it for himself. In other words, Jasper obtained 92% of all of the *1025 Plan's assets in November 2001, and the Court is to believe that "obviously" Edlin was trying to withhold every dollar he could for himself.
Simply put, Jasper has not satisfied the Woo test. Even if there is a palpable conflict of interest or serious procedural irregularity, it must cause a serious breach of the plan administrator's fiduciary duty to Jasper. There has been no evidence put forth by Jasper that Edlin's personal interest in the Plan's funds have caused Jasper to suffer losses. In fact, all the Court has before it concerning Edlin is speculation, that because he benefits under the Plan if Jasper does not, then the Court is to conclude that Edlin must be causing the Plan Administrator to breach its fiduciary duty. This is too big of a leap. Jasper has not shown any evidence that he is entitled to a less deferential standard of review.
Therefore, the Court is asked to review three specific issues, namely whether Defendants abused their discretion by: 1) utilizing a valuation date other than March 31, 2001, 2) selecting October 1, 2001 as the special valuation date, and by 3) paying Jasper his account value on a date later than September 1, 2001 (in November 2001).[5] Each issue will be reviewed under the appropriate standard.

Utilization of a Valuation Date other than March 31, 2001
The first issue is whether the decision by the Plan Administrator to select a valuation date other than March 31, 2001, in other words a special valuation date, was arbitrary and capricious. The Plan Administrator's decision will be upheld if it is reasonable, not that a reasonable person would have reached that same decision, but that a reasonable person could have reached that decision. Jackson, 303 F.3d at 887. Furthermore, under Finley the interpretation of the Plan must 1) be consistent with the goals of the Plan; 2) not render any language in the Plan meaningless or internally inconsistent; 3) must not conflict with the substantive or procedural requirements of the ERISA statute; 4) have interpreted the words at issue consistently; and 5) not be contrary to the clear language of the Plan. Finley, 957 F.2d at 621.
The Plan's regular valuation date has been March 31 in the past. (AR 00104). This has been determined by reading the Plan which states that the definition of valuation date is the last business day of each Plan Year, and each special date designated by the Administrator under Section 20.4 and agreed to by the Trustee; and taking the definition of Plan Year which is described as the twelve consecutive month period that begins each April 1 and ends the following March 31. (AR 00013-14). Thus, if any other date is selected other than the valuation date of March 31st, it is a special valuation date.
The Plan has two relevant provisions discussing special valuations. First the use of a special date is discussed in the Plan, "Valuation Date means the last business day of each Plan Year and each special date designated by the Administrator *1026 under Section 20.4 and agreed to by the Trustee." (AR 00014.) (emphasis added). With regard to this provision, it alone cannot enable the Plan Administrator to unilaterally act in choosing a special date because Jasper himself was serving as Trustee and he did not agree. This provision specifically requires his agreement. Even though he purported to resign as Trustee, his resignation was ineffective because under the Plan a Trustee's resignation is only effective when a successor Trustee is appointed. Therefore, Jasper was Trustee until March 18, 2002, when Edlin was appointed.
Second, the meaning of a special valuation date is discussed In Article XX in § 20.4, "Special Valuations. The Administrator may designate a special Valuation Date to avoid prejudice to any Participant under the Plan. Such special Valuation date shall be treated as a Valuation Date solely for purposes of allocating Trust Fund earnings among the Accounts." (AR 00043). This provision, unlike the aforementioned provision, does not require any agreement from the Trustee.[6] In fact, it just requires that the Administrator choose a date to avoid prejudice to any Plan participant.
Jasper agrees in his Reply Memorandum, "The Plan does allow the designation of a different Valuation Date in order `to avoid prejudice to any Participant under the Plan.'" However, he contends that "to allow Defendants to designate October 1, 2001, as a special valuation date would prejudice him, not `avoid prejudice' to him." See Plaintiffs Memorandum in Opposition at 6. Therefore, Jasper's position is that the October 1, 2001, valuation date caused him prejudice and was hence unreasonable. Yet, he is not the only participant in the plan. The issue becomes whether the Plan Administrator was reasonable in choosing a special valuation date "to avoid prejudice to any participant under the Plan," and the special valuation date expressly states that it can be chosen to avoid prejudice to any plan participant which would include the five other participants besides Jasper, such as Edlin, the receptionists, and the dental hygienists. (AR 00092).
To determine if the selection of a special valuation date of October 1, 2001, was reasonable requires an understanding of the facts at the time Jasper terminated his employment and made his request for distribution. Defendants contend in their Response to Plaintiffs Motion for Summary Judgment that the Plan did not receive proper notice of the election until it received Jasper's Benefit Distribution Election Form by certified mail on August 6, 2001, and that the Plan had never faced such a large distribution because Jasper's account amounted to more than 90% of the Plan's assets. (AR 00127; AR 00133). Furthermore, Defendants maintain that *1027 when the Corporation became the Plan Administrator in July 2002, it was not familiar with the Plan's investments because Jasper had been the sole Trustee and Administrator of the Plan. The Corporation also discovered that Jasper had failed to liquidate any of the Plan's assets prior to September 25, 2001, even though Jasper was Trustee and the assets would need to be liquidated in order to give him a distribution. (AR 00129; AR 00198; AR 00301; AR 00353; AR 00461). Additionally, a significant portion of the Plan was invested in the Sawgrass Fund which imposed large penalties if any money was withdrawn outside the months of June and December. (AR 00130). In other words, Jasper as Trustee had originally caused the Plan to purchase the Sawgrass fund and should have known when it could be liquidated without penalty, but at the time his Benefit Distribution Election Form was received by the Plan on August 6, 2001, his request was outside of June and December and would subject the distribution to a substantial penalty. (AR 00130). To make matters more complicated, the Corporation had considerable difficulties, to which Jasper has agreed, in getting the various brokerage houses to work with the Corporation without the consent of Jasper, the Trustee.
While the investments were still illiquid, then came September 11, 2001. The NYSE, Mercantile Exchange, and NADAQ remained closed for days. The Dow Jones Industrial Average closed down 684.81 points on its first day open after the attacks. Of course, the negative impact on the markets decreased the value of the assets in the Plan. In fact, the Plan no longer had the assets to pay Jasper his distribution as of the March 31 valuation date because he would have been owed $2,228,501.00 and on September 30, 2001, the Plan's assets only amounted to $2,218,696.00 (AR 00523). The Plan Administrator, in view of an unprecedented national crisis that killed thousands of people and shut down the markets for days, came to the conclusion that the Plan could not afford to pay Jasper even if it were to wipe out all of the other Plan participants' benefits.
On September 25, 2001, counsel for the Corporation sent a letter to Jasper which contained the following:
As you are probably aware, the events of September 11, 2001 have had a dramatic impact on the stock market. We are advised that the value of the Plan as of September 21, 2001 is approximately $2,100,000. Thus, if the Plan's assets are liquidated at this time, the proceeds would not be sufficient to cover your account balance as of March 31, 2001 ($2,228,500). Moreover, all other participants' accounts in the Plan would be completely eliminated... If you do not agree to withdraw your distribution request, the Company, as plan administrator, in order to avoid undue prejudice to the other Plan participants will have no choice but to exercise its right under Section 20.4 of the Plan and designate a "special valuation date". In such event, the Company, as plan administrator, intends to designate October 1, 2001 as the special valuation date. Accordingly, your distribution would be equal to your proportionate share (approximately 92.68%) of the value of the Plan determined as of October 1,2001. (AR 00117-8; emphasis added).
In order to avoid wiping out all of the other participants' accounts because of the Plan's assets that were diminished on September 11th, the Plan Administrator decided to choose a special valuation date to "avoid prejudice to any participant of the Plan," namely all of the other participants. It did not mean that only Jasper would suffer the repercussions of September 11, but rather that all Plan participants would *1028 suffer their pro rata share, and the other participants would not be completely wiped out of their assets under the Plan or prejudiced by the fact that the assets had not been liquidated for distribution.
The Plan Administrator's decision to use a special valuation date in this case is consistent with the goals of the Plan because the Plan Administrator was considering the assets of all the participants, it does not render any Plan language meaningless, there is no conflict with any procedural requirements of ERISA, and the decision to not use March 31 as a valuation is not contrary to the clear language of the Plan which does indeed permit special valuation dates. Finley, 957 F.2d at 621. Therefore, the decision is a reasonable one and it easily survives four of the five components of the Finley test. Id.
The remaining part of the Finley test is whether the Plan Administrator has interpreted the words at issue consistently. The special valuation date in the Plan has not been used for twenty years, which is probably why it is called "special." (AR 00104; AR 00114) Therefore, it cannot be determined if it has been used consistently. There is nothing inconsistent about its use here; however, and for Jasper to maintain that the valuation date of March 31 is the only reasonable date that could have been used, would be to render the special valuation date provision in the Plan to be completely superfluous and meaningless. Defendants' believe that in the face of an unprecedented crisis that sent the markets plummeting, the Plan Administrator acted prudently and in the best interests of the Plan and the participants by choosing a special valuation date in this case to save a few assets for the other Plan participants. It was not an abuse of discretion for the Plan Administrator to choose a special valuation date in these circumstances as allowed for by the Plan to avoid prejudice to any participant. Thus, the Plan Administrator's actions in this matter were not arbitrary and capricious, and the Administrator did not abuse its discretion in choosing a special valuation date.

Selecting October 1, 2001 as the Special Valuation Date
The second issue is whether the decision by the Plan Administrator to select October 1, 2001, as the Special Valuation Date was arbitrary and capricious. As already discussed above, it was reasonable for the Plan Administrator to utilize a valuation date other than March 31. In order for October 1, 2001, to stand it must have been a reasonable determination by the Plan Administrator and not an abuse of discretion.
First, the October 1, 2001, date was in the future when it was selected which meant that there could be no bias in selecting a particular date that was either a good or bad day for the markets, and hence there could be no manipulation in value of Jasper's benefits, or anyone else's benefits for that matter. Second, each participant had to bear their pro rata share of the September 11th market fallout. Furthermore, nothing in the Plan gives guidance to direct a special valuation date other than it is to avoid prejudice to any Plan participant. Once it is determined that a special valuation date may be selected to avoid prejudice, there is no Plan provision directing the Plan Administrator to select any particular date.
Under Finley the selection of the October 1, 2001, date must be 1) be consistent with the goals of the Plan; 2) not render any language in the Plan meaningless or internally inconsistent; 3) must not conflict with the substantive or procedural requirements of the ERISA statute; 4) result from having interpreted the words at issue consistently; and 5) not be contrary *1029 to the clear language of the Plan. Finley, 957 F.2d at 621. The selection of October 1, 2001 is 1) consistent with the goal of the Plan which is to provide a method for the accumulation of a fund to assist Participants to attain financial security in the event of retirement, and to assist Beneficiaries in the event of a Participant's death; (AR 00007) 2) does not render any language in the Plan meaningless or internally inconsistent; 3) does not conflict with ERISA; 4) the words at issue have been interpreted consistently; and 5) the selection of October 1, 2001, is not contrary to the clear language of the Plan. Id. Therefore, the selection of October 1, 2001, by the Plan Administrator was reasonable, and choosing such a date was not an abuse of discretion.

Paying Jasper his Account Value on a Date Later than September 1, 2001 (in November 2001)
The third issue is whether the decision by the Plan Administrator to begin paying Jasper his account value later than September 1, 2001, was arbitrary and capricious. Jasper has interpreted the Plan in a way that would give him a distribution date of September 1, 2001, and therefore the valuation date of October 1, 2001, would not only be difficult to apply as a practical matter, but would be in Jasper's view an abuse of discretion. The Plan Administrator's decision regarding the date of payment must be reasonable and must survive the five-part Finley test.
As an initial matter, the date Jasper consented to his benefits disbursement is significant because under the Plan this date dictates when Jasper was entitled to payment. The Plan states, "[A] Participant shall be entitled to payment of his Profit Sharing Benefit ... as follows: The first day of the calendar month that coincides with or next follows the date 60 days after the date the Participant (and his Spouse, if applicable) consent to distribution prior to the normal time provided such date occurs after the Participant's termination of employment." (AR 00026).
There is no dispute that Jasper's employment terminated prior to any consent for the distribution of his benefits. However, there is some controversy as to the date his termination became effective and as to the date he consented to distribution. Each issue will be taken in turn.
First, Jasper's effective termination of employment date is determined by his Employment Agreement which states that the employment may be terminated at any time, with or without cause or reason, upon thirty (30) days prior written notice to employer; or immediately upon any material breach by the Corporation which the Corporation did not timely cure. (AR 00087H). Defendants assert that pursuant to the Employment Agreement, the termination date was July 12, 2001, because it was 30 days after June 12, 2001, when Jasper submitted his termination letter. Jasper has asserted that pursuant to the Employment Agreement, his employment terminated on June 12, 2001, because of a material breach by the Corporation. However, that claim of a material breach was handled in arbitration, and the arbitrator found that there had not been any breach. (AR 00096Q; AR 00127; AR 00596). Furthermore, Jasper has failed to add the thirty days prior written notice as required in the Employment Agreement.
Defendants' determination in interpreting the effective termination date in light of the Employment Agreement is not unreasonable. Defendants simply added the 30 days, as required in the Employment Agreement, to the date of the resignation letter and determined Jasper's termination date to be July 12, 2001.
Second, there is disagreement regarding the date on which Jasper consented to the disbursement of his benefits and consequently *1030 the date on which that disbursement was due. Jasper's position is that the "consent" date is the date of the letter, June 15, 2001, which would mean that under the aforementioned Plan provision, sixty days after would be August 14, 2001, and the first day of the next calendar month would be September 1, 2001. Therefore, Jasper contends that he was entitled to disbursement on September 1, 2001. The Defendants maintain that the "consent date" is the date of the receipt of the letter, August 6, 2001. Sixty days after would be October 5, 2001, and the first day of the following month would be November 1, 2001. (AR 00026). As such, Defendants determined that Jasper was entitled to disbursement on November 1, 2001.
Although Jasper contends that he consented to distribution on June 15, 2001, because that is the date on his letter, the Administrative Record shows that the Plan Administrator received Jasper's letter on August 6, 2001. (AR 00127). Surely, Jasper must consent to someone, and it is not unreasonable to say that the consent be directed to the Plan Administrator, the one who can actually disburse the funds.[7] Even if it is ambiguous as to what consent means in that either the date of the letter controls or the date of the receipt of the letter controls, the Plan Administrator has the authority to resolve all ambiguities, and it would not be unreasonable to interpret consent as the date the letter was received.[8]
Furthermore, in regard to disbursement, the Plan in § 10.6 gives wide latitude to the Plan Administrator to delay disbursement of funds. In that section, it states, "Subject to the limitations above, a payment may be delayed if delay is necessary to calculate the payment or for other administrative reasons and, in the event of delay, no adjustment shall be made for interest or earnings." (AR 00027). As discussed above, there were several administrative reasons that could have been asserted for the lack of disbursement, most notably that the funds were not liquidated, and that Jasper as trustee needed to give his signature in order to free up the benefits in the Plan.
The selection of November 1, 2001, is consistent with the goals of the Plan, does not render any language in the Plan meaningless or internally inconsistent, does not conflict with the substantive or procedural requirements of the ERISA statute, and is not inconsistent, or contrary to the clear language of the Plan. Finley, 957 F.2d at 621 (8th Cir.1992). Although, Jasper would prefer or even interpret another date such as September 1, 2001, over November 1, 2001, as the disbursement date; the Court cannot disturb the Plan Administrator's disbursement date unless it is unreasonable, which it is not. Leonard, 341 F.3d at 701.
Finally, Defendants have asserted a counterclaim. In Defendants' Response to Plaintiffs Motion for Summary Judgment, Defendants have urged the Court "to address their Counterclaim only if the Court were to find merit in Plaintiff's claims." Id. at 16. Therefore, the Court will not reach Defendants' counterclaim, and as such it is moot.
*1031 Accordingly,
IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (# 28) be and hereby is GRANTED.
IT IS FURTHER ORDERED that Plaintiffs Cross Motion for Summary Judgment (# 30) be and hereby is DENIED.
IT IS FINALLY ORDERED that Defendants' counterclaim (# 25) is moot.
NOTES
[1] On August 1, 2002, Jasper made a claim for benefits requesting the valuation date of March 31, 2001, stating that he should have received a total of $2,228,500.00. (AR 00102-118). On October 24, 2002, the Plan advised Jasper that his claim was denied. (AR 00140-150). Jasper submitted a request for a review of the denial on December 20, 2002. (AR 00579-586). In letter dated February 17, 2003, the Corporation advised Jasper that its review was complete and that the Plan's decision to deny Jasper's claim was confirmed. (AR 00592-00612).
[2] The following facts are excerpted from the Administrative Record. Defendants attached the agreed to Administrative Record as Exhibit A to their Motion for Summary Judgment which they filed on December 5, 2003.
[3] The Sawgrass Fund was an investment in Jasper's account. A penalty would be imposed if it were liquidated, and therefore Jasper's counsel proposed a solution where the value of the investment could be paid to him and the Plan could liquidate the investment at an appropriate time. (AR 00461). On November 21, 2001, the Plan advised Jasper that such funds could not be transferred to Jasper's IRA outside CIBC Oppenheimer, but that an IRA could be established for Jasper at CIBC Oppenheimer, the Sawgrass Fund could be transferred from the Plan to that IRA, and then the Fund could be transferred from that IRA to Jasper's outside IRA. The Plan provided Jasper with the transfer paperwork. (AR 00532-00535). Subsequently, Jasper signed relevant paperwork on November 30, 2001 and on December 12, 2001 such proceeds from the Sawgrass Fund were transferred to Jasper's outside IRA on January 11, 2002, and on March 12, 2002. (AR 00148, AR00569-578).
[4] Defendants allege that if the actions of the Plan Administrator were arbitrary and capricious, the most that Jasper could seek would be an additional $169,996.77 under the Plan. Jasper alleges in reply that the proper measure of damages is the difference between Jasper's account value as of March 31, 2001 ($2,228,500.00) and the account's value as of October 1, 2001 ($2,055,834.00). See Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment and Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment at 13. The exact amount is relevant only if the Court finds that Jasper is entitled to relief, which it does not. See Discussion.
[5] Defendants have argued that Jasper is wrong to contend that it was an abuse of discretion for the Plan Administrator not to adopt June 15, 2001, as a special valuation date. See Defendants' memorandum at 8-10. However, Jasper in Reply has explained that this date was part of other discussions between the parties and that "Defendants' decision not to adopt June 15, 2001, as a valuation date is accepted by Dr. Jasper and is not before the Court at this time." Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary judgment and Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment at 5. Therefore, the Court will not address whether June 15, 2001, would be an appropriate special valuation date.
[6] Even if the two provisions are ambiguous because one requires the Trustee to agree to the date and the other provision does not even mention the Trustee, then under the Plan the Administrator has the discretion to resolve ambiguities. Section 18.2 of the Plan provides, "The Administrator shall have such powers... which are appropriate to administer the Plan, including, but not limited to, the power to construe the terms of the Plan and to remedy ambiguities, inconsistencies or omissions..." (AR 00039). In fact § 18.2 gives a great deal of discretion to the Administrator including: the power to determine all questions arising under the Plan, including the power to determine the rights or eligibility of an Employee, Participant, or Beneficiary, and the amount of any benefits due any such person, under the Plan; adopt such rules of procedure as it considers appropriate for the proper administration of the Plan and are consistent with the Plan; enforce the provisions of the Plan and the rules of procedure which it adopts; direct payments or distributions from the Trust Fund under the provisions of the Plan, etc. Id.
[7] Consent is defined by Merriam-Webster as 1: to give assent or approval and 2: to be in concord in opinion or sentiment. Under the first definition, Jasper gave assent when the letter was received. He may have intended to consent the day he typed his letter, but he did not give assent until the letter was received. Under the second definition, there was no concord in opinion or sentiment until they received Jasper's letter. Before they received his letter, only Jasper had knowledge of the letter and of his intent to seek a distribution.
[8] See footnote 6.